**UNITED STATES of America,**
**Appellant,**

v.

**COMPUTER SCIENCES CORPORA-**
**TION, John W. Luke, Erwin L. Allen,**
**Thomas A. Marti, Norman W. Derrick,**
**Peter C. Loux, Herbert G. Blecker, Ap-**
**pellees.**

**UNITED STATES of America,**
**Appellant,**

v.

**COMPUTER SCIENCES CORPORA-**
**TION, John W. Luke, Erwin L. Allen,**
**Thomas A. Marti, Norman W. Derrick,**
**Peter C. Loux, Herbert G. Blecker, Ap-**
**pellees.**

Nos. 81–5053, 81–5099.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 7, 1982.

Decided June 16, 1982.

Certiorari Denied Jan. 10, 1983.

See 103 S.Ct. 729.

Frank J. Marine, Dept. of Justice, Washington, D. C. (Justin W. Williams, U. S. Atty., Alexandria, Va., William S. Lynch, David H. Hopkins, Lawrence J. Leiser, Joseph H. Payne, Dept. of Justice, Washington, D. C., on brief), for appellant.

Milton Eisenberg, Washington, D. C. (Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., on brief), for appellees.

Walter J. Bonner, Washington, D. C. (Thomas A. Guidoboni, Bonner, Thompson, O'Connell, Gaynes & Middlekauff, Washington, D. C., on brief), for Norman W. Derrick.

Nathan Lewin, R. Stan Mortenson, Miller, Cassidy, Larroca & Lewin, Washington, D. C., on brief for John W. Luke.

Barry Wm. Levine, David R. Addis, Dickstein, Shapiro & Morin, Washington, D. C., on brief for Erwin L. Allen.

Thomas L. Patten, Allen B. Green, McKenna, Conner & Cuneo, Washington, D. C., on brief for Thomas A. Marti.

Barnet D. Skolnik, Washington, D. C., on brief for Peter C. Loux.

Daniel J. Hurson, Hurson & Fox, Washington, D. C., on brief for Peter C. Loux.

Jacob A. Stein, Robert F. Muse, Stein, Mitchell & Mezines, Washington, D. C., on brief for Herbert G. Blecker.

Before MURNAGHAN and ERVIN, Circuit Judges, and WILKINS,* District Judge.

MURNAGHAN, Circuit Judge:

Resourceful lawyers representing criminal defendants often desire to be thorough and to overlook nothing in their commendable zeal to afford first-class representation. Consequently in many cases they tend to excess as they inundate us with a plethora of arguments, some good and some not so good. Sometimes one wonders whether such lack of selectivity is not counterproductive, for a party raising a point of little merit exposes himself to the risk of excessive discount for a better point because of the company it keeps.

The present case raises numerous issues, but, in fairness to counsel, it should be said that few, if any, of them are trivial or frivolous.

## I. *The Procedural Posture of the Case*

The case comes before us from a dismissal by the district court[1] of all fifty-seven counts in an indictment charging:

(a) conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(c) and (d) (Count 1);

(b) the substantive offense of participating in the affairs of the enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(c) (Count 2);

(c) use and the investment of income received from a pattern of racketeering activity in the operation of an enterprise, 18 U.S.C. § 1962(a) (Count 3);

(d) defrauding the United States by overbilling the General Services Administration through causing checks drawn on the United States Treasury to be mailed, 18 U.S.C. § 1341 (Counts 4 through 27);

(e) defrauding the United States through overbilling of the GSA for computer services employing interstate wire transmissions, 18 U.S.C. § 1343 (Counts 28 through 37);

(f) bringing about the mailing of improperly inflated invoices to GSA, 18 U.S.C. § 1341 (Counts 38[2] through 43);

---

* The Honorable William W. Wilkins, Jr., United States District Judge for the District of South Carolina, sitting by designation.

1. The opinion is reported as *United States v. Computer Sciences Corp.*, 511 F.Supp. 1125 (E.D.Va.1981).

2. For an entirely independent reason not related to the issues disputed by the parties, namely

(g) causing the presentation of false claims to the United States Government for computer services, 18 U.S.C. § 287 (Counts 44 through 55);

(h) two additional charges of false claims to the United States Government, 18 U.S.C. § 287 (Counts 56 and 57).

Counts 1 and 2 charged all defendants. Count 3 charged Computer Sciences Corporation (CSC) alone. The defendants in Counts 4 and 5 were John W. Luke, Erwin L. Allen, and Thomas A. Marti. Counts 6 through 37 lay against CSC, Luke, Allen, Marti, and Norman W. Derrick. Counts 38 through 43 named as defendants CSC, Luke, Allen, Peter C. Loux, and Herbert G. Blecker. Counts 44 and 55 charged CSC, Luke, Allen, and Marti. Those charged under Counts 46 through 55 were CSC, Luke, Allen, Marti, and Derrick. Counts 56 and 57 charged CSC, Luke, Allen, Loux, and Blecker.

Dismissal by the district court of the counts proceeded on two different bases. Counts 4 through 43 were dismissed for the reason that the mail fraud and wire fraud offenses charged, involving as they did fraud against the United States government, were precluded by the false claims statute which, upon enactment, had ousted any other statute which by its terms might proscribe the same offenses against the government. Consequently, on the theory on which the district judge was proceeding, the more general mail and wire fraud statutes, which were not yet even in existence, nevertheless anticipatorily were foreclosed and the false claims act became the only vehicle permitting prosecution of mail and wire fraud crimes against the government. The district judge contemplated that, absent a reversal on appeal, his decision would finally dispose of Counts 4 through 43.

The second dismissal theory applied to all fifty-seven counts, resting on the theory that the proceedings of the grand jury [3] had been contaminated through the unauthorized entry into the grand jury room while that body was in session of persons to whom Fed.R.Crim.P. 6(d) did not grant the right to be present. That such an infringement of Rule 6(d) occurred is admitted by the government.

Additionally, insofar as defendant Derrick was concerned, the district judge dismissed Counts 1, 2, 6 through 37 and 46 through 55 against him with prejudice on the grounds of prosecutorial misconduct. Furthermore, the RICO counts (1 through 3) were dismissed for the reasons that (1) Infonet, an unincorporated division of a corporation (CSC), which was the enterprise charged in Counts 1 through 3 could not qualify as an "enterprise," since it lacked sufficient independent existence for that purpose; (2) there was no showing in the indictment of a benefit flowing from the racketeering activity to the Infonet Division; and (3) the dismissal on the substantive grounds of preemption by the false claims statute of the mail fraud and wire fraud charges reduced the predicate acts remaining to one, a bribery alleged but not prosecuted, being more than five years old and the statute of limitations having run. Therefore, ran the reasoning of the district judge, the quantity of predicate acts was insufficient to establish a pattern of racketeering activity.

The counts dismissed solely on grounds of impropriety in the conduct of the grand jury proceedings were not dismissed with prejudice, leaving it open to the government to seek reindictment through a new grand jury proceeding.

II. *Disposition of the Several Contentions Raised*

A. *The improper presence in the grand jury room of unauthorized persons.*

 A review of the record satisfies us that the invasions of the grand jury proceedings were rare, inadvertent and non-

---

a time-bar, the government consented to the dismissal of Count 38, and did not appeal the dismissal of that count.

3. The grand jury investigation had a life of eighteen months during 1979 and 1980.

prejudicial to any defendant.[4] We do not mean to be taken as saying that those conclusions necessarily insulate an indictment and validate it in every case. Rather, each situation should be addressed on a *sui generis* basis. For a prosecution as to which the grand jury required only a day or two or a week or two to complete its investigation and to return an indictment, the posture in terms of frequency, inadvertence, and prejudice might differ, although the acts sullying the purity of grand jury proceedings were substantially like the ones with which we here concern ourselves.

In the course of a grand jury investigation lasting eighteen months, intrusions by unauthorized persons occurred on five occasions. Duration of the entire proceedings is a significant measuring background when it comes to assessing the importance of specific interruptions. Each intrusion was brief, lasting no more than a minute or two. On two occasions, a Deputy U. S. Marshal came in the room, handed a document to the prosecutor leading the grand jury proceeding, leaving promptly after doing so. On a third occasion, the Marshal entered for a purpose not identified in the record and left immediately. An unidentified woman once entered, handed a document to the prosecutor and left. The final occasion occurred in the summer of 1979. Complaints had been made about the heat. Someone charged with the maintenance of the air conditioning equipment entered and interrupted the proceedings. He departed on being instructed by the prosecutor to leave the room inasmuch as the grand jury was in session. Each intrusion brought the proceedings to an abrupt halt, and no testimony was taken in the presence of the unauthorized persons.

On the record we are satisfied that this is a case "absent demonstrable prejudice or substantial threat thereof" so that "dismissal of the indictment is plainly inappropriate."[5] *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). *Cf. United States v. Rath*, 406 F.2d 757 (6th Cir. 1969), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1196, 22 L.Ed.2d 453 (1969) ("A technical violation of Rule 6(d), Federal Rules of Criminal Procedure, occurred when an attorney who was a stranger to this action unintentionally interrupted the grand jury proceedings by entering the courtroom in which they were being conducted. The record establishes that the proceedings were halted at the moment of his entrance, and were not resumed during the fifteen to twenty second period of his presence. We hold that the interruption did not invalidate the proceedings or the indictment."). *See United States v. Kazonis*, 391 F.Supp. 804, 805 (D.Mass.1975), *aff'd without opinion*, 530 F.2d 962 (1st Cir. 1976), *cert. denied*, 429 U.S. 826, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976).

The case before us, in short, is one where there has been no intrusion of significant duration nor any showing of deliberate rule disregard by the government or prejudice to the defendant.[6] Life must go on. Attainable reality, not perfection, here suffic-

**4.** It is relevant to observe that no grand jury witness complained of the momentary intrusions. Diligent lawyers for the defendants first raised the point following review by them of grand jury transcripts. They were, however, unable to advance any basis for saying that the defendants were prejudiced, aside from the Rule 6(d) infraction itself.

**5.** One must bear in mind the long period of time over which the incidents were distributed and also must recognize that human life cannot be conducted on absolute principles. Mortals must accept and adjust to the substantial likelihood of occasional intermittent failures to attain and maintain perfection.

**6.** The existence of such considerations, including presence in the grand jury room of much

greater duration, distinguishes other cases which have voided indictments. *Cf. United States v. Edgerton*, 80 F. 374 (D.Mont.1897) (expert witness remained after testifying and asked questions of another witness); *Latham v. United States*, 226 F. 420 (5th Cir. 1915) (unauthorized person was present to record testimony throughout the grand jury proceeding); *United States v. Carper*, 116 F.Supp. 817 (D.D.C.1953) (deputy marshals present throughout testimony of prisoner witnesses); *United States v. Borys*, 169 F.Supp. 366 (D.Alaska 1959) (mother of witness present throughout her testimony); *United States v. Bowdach*, 324 F.Supp. 123 (S.D.Fla.1971) (FBI agent called upon by prosecutors to enter grand jury room to play a recording device during the testimony of a witness); *United States v. Daneals*, 370

es. It is simply inappropriate to nullify grand jury work stretching out over a period of eighteen months because of technical, trivial, harmless violations of no significant duration of Fed.R.Crim.P. 6(d).

We should not be understood as commending the practice here. With the exception of the maintenance man, all of the intruders were apparently under the control of the prosecutors, who were obviously not diligent in keeping the sanctity of the grand jury room inviolate. Prosecutors should not consider what we have written as in any way amounting to an encouragement to depart from scrupulous compliance with Fed.R.Crim.P. 6(d). Having been fortunate enough to survive the attack here by the skin of their teeth on the basis of the record as a whole, they cannot count with any assurance on a similar conclusion on another record involving unauthorized grand jury room intrusions.

F.Supp. 1289 (W.D.N.Y.1974) (unauthorized agency regional counsel appeared and advised grand jury); *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579, 589 (W.D.Tex.1977) (unauthorized person present throughout as observer and assistant prosecutor); *United States v. Phillips Petroleum Co.*, 435 F.Supp. 610 (N.D.Okl.1977) (unauthorized person was present throughout the testimony of a witness and conducted part of the questioning).

Any support afforded by *United States v. Furman,* 507 F.Supp. 848, 852–54 (D.Md.1981), for the proposition that there is an inflexible requirement that an unauthorized presence in the grand jury room mandates dismissal of the indictment (there an excused grand juror who was unaware of her change in status participated in a day's proceedings) is dissipated by the reversal in *United States v. Furman,* 4th Cir. 1981, 672 F.2d 914 (unpublished). The reversal rested on the conclusion that Fed.R. Crim.P. 6(b), rather than Rule 6(d), applied.

7. An implication of the district court's rationale is that, even if 18 U.S.C. § 287 were, for some reason, ruled invalid or inapplicable, or if it were repealed, there could still be no mail fraud or wire fraud prosecution, where the government is the defrauded person, although all the requirements spelled out in the mail and wire fraud statutes would be fully satisfied.

8. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of

## B. *Dismissal of the mail fraud and wire fraud counts.*

The trial court's approach involved a determination that there had existed a legislative intent, when Congress enacted 18 U.S.C. § 287, the statute outlawing false claims against the government, to make prosecution under 18 U.S.C. § 287 exclusive, and to preclude prosecution thereafter under the subsequently enacted mail fraud and wire fraud statutes for the same activities even though they might, viewed without regard to 18 U.S.C. § 287, meet the description of the crimes of mail and wire fraud.[7] ) The mail fraud statute, 18 U.S.C. § 1341,[8] was originally enacted in 1872, the wire fraud statute, 18 U.S.C. § 1343,[9] in 1952.

The statute punishing false claims against the United States began its life in

false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or any thing represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

9. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

1863,[10] was reenacted as part of a comprehensive revision of the Criminal Code in 1909, and in 1948 was divided into two parts. One of the parts became 18 U.S.C. § 287,[11] which makes it criminal to present false claims against the government. The other part, which punishes false statements to the government, was codified as 18 U.S.C. § 1001.[12]

Perusal of the false claims statute, on the one hand, and of the mail fraud and wire fraud statutes, on the other, discloses no language suggesting mutual exclusivity insofar as prosecution is concerned. The district court placed great reliance on the cases of *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), and *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). However, those cases dealt with situations where a statute includes within its language its own enhanced punishment provisions (for example, bank robbery with a dangerous weapon has an enhanced punishment as compared to bank robbery alone). Since the particular statute controls and rules out the more general, those cases reach the sensible result that a general enhancement statute (applying to all crimes involving use of firearms) is ineffective as a second enhancer.

Here, however, we have the situation not at all uncommon, as the case of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and its numerous close relatives, demonstrate, of more than one statute infringed by a single act or combination of acts. Dismissal by the district judge of the indictment as to the counts charging wire fraud and mail fraud occurred at a very early stage of the case, before the taking of any evidence and, of course, before any adjudication of guilt. It will be time enough to determine whether the *Blockburger* test, calling for a restriction to a single *punishment,* applies if and when the time should ever arrive when the defendants or some of them are found guilty both of wire fraud or mail fraud, on the one hand, and of false claims against the United States, on the other. Whatever the answer to that question may be, however, it does not relate to the right of the government to prosecute under both a wire fraud or mail fraud statute and the false claims statute. Guilt and punishment are two distinct and separate considerations. Finding nothing in the statutory language itself or in the legislative history of the wire fraud, mail fraud and false claims statutes to require a determination that prosecution under one must be at the expense of prosecuting under the other, or any evidence of an intent to withdraw from one statute a coverage it obviously has standing alone because of a coverage also afforded by another statute,[13] we conclude

10. Since the mail fraud and wire fraud statutes did not exist in 1863, it requires a great stretch of imagination to attribute an intent to Congress in 1863 prospectively to render inapplicable to frauds against the government any statute which might later be enacted by a subsequent Congress or Congresses.

11. Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

12. Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations; or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

13. *Cf. United States v. Weatherspoon,* 581 F.2d 595, 599–600 (7th Cir. 1978) ("[T]here is nothing in either the language or the legislative history of the false statements statute, 18 U.S.C. § 1001, reflecting any Congressional intent to create a hierarchy of sanctions that would preempt the application of the mail fraud statute, 18 U.S.C. § 1341, to the submission of false statements to a government agency through the use of the mails.... We hold that, by using the mails to submit false statements to a government agency, Weatherspoon subjected herself to separate prosecution and punishment under both the mail fraud and false

that dismissal of the wire fraud and mail fraud charges was in error.[14]

In a recent, related case, *United States v. Blecker,* 657 F.2d 629, 636 (4th Cir. 1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982), we had occasion to make an observation also pertinent here: "[Defendants'] argument, however, is premised on a construction of the scope of the mail fraud statute that is far too narrow."

C. *The claim of prosecutorial misconduct with respect to defendant Derrick.*

■ The action of the district court in dismissing counts 1, 2, 6 through 37 and 46 through 55 with prejudice insofar as Derrick was concerned proceeded from the conclusion that the prosecutors overreached to his severe prejudice. We read the record otherwise. As part of the investigation by the government, the defendants, particularly the principal corporate defendant CSC, cooperatively supplied records. Derrick was assigned the responsibility of assembling the records in order to meet a subpoena issued against CSC. Supposedly the government engaged in "dirty tricks" by permitting Derrick to testify before the grand jury without prior warning that he was a target of the investigation.

General counsel for CSC had asked early in the investigation that all grand jury subpoenas for CSC records and for the testimony of CSC employees be finalized through him. General counsel called on Derrick to assemble the documents and to inform government counsel and other personnel as to various subpoena aspects. Derrick was informed by general counsel that he was "expected to cooperate fully with the government's investigation." Pursuant to the instructions of general counsel, Derrick met several times with government counsel and on March 5, 1980 responded to a grand jury subpoena and testified. Except for a telephone conversation with government personnel about a subpoena to CSC which issued about one month after his testimony, Derrick had no further contacts with the government's personnel. In October, 1980, six months later, Derrick's indictment took place.

The government has convincingly established that only towards the end of the investigation, following analysis of voluminous records, did the government reach a conclusion that indictment of Derrick was merited. The government has demonstrated that Derrick was not a target of the investigation at the time he testified in March, 1980. The district judge made no finding to the contrary. On those grounds alone we are satisfied that dismissal against Derrick was not warranted at all, let alone dismissal with prejudice.

It is, therefore, unnecessary that we consider further contentions to the effect that, even had Derrick been a target when he appeared before the grand jury, the government was not required to alert him of his exposed position. *See United States v.*

statements statutes."); *contra United States v. Henderson,* 386 F.Supp. 1048 (S.D.N.Y.1974). The holding in *Henderson* was flatly rejected in *United States v. Miller,* 545 F.2d 1204, 1216 n.17 (9th Cir. 1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977), which lists several cases inconsistent with *Henderson.* It was questioned by its own Circuit, *United States v. Mangan,* 575 F.2d 32, 49, text at n.21 (2d Cir. 1978), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978). *See also United States v. Shermetaro,* 625 F.2d 104, 111 (6th Cir. 1980).

14. We pass rapidly over the contention that dismissal of the wire fraud counts was proper in the absence of allegations that the wire transmissions themselves were false or fraudu-

lent. It is well recognized that the wire fraud statute, patterned on the mail fraud act, was meant to receive like interpretation. *United States v. Tarnopol,* 561 F.2d 466, 475 (3d Cir. 1977); *United States v. Donahue,* 539 F.2d 1131, 1135 (8th Cir. 1976). It is also well recognized that innocence in a mailing, the consideration that a mailing was absent criminal intent, does not insulate from mail fraud prosecution if the mailing was a step in the fraudulent path. *Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916); *United States v. Blecker,* 657 F.2d 629, 637 (4th Cir. 1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982); *United States v. Caldwell,* 544 F.2d 691, 696 (4th Cir. 1976).

*Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977). Nor do we undertake to ascertain the strength or weakness of the government's contention that the warnings given to Derrick prior to his March 5, 1980 appearance before the grand jury, although they did not expressly allude to his "target" status, nevertheless, sufficed to warn him of his Fifth Amendment rights.

The district judge rested his determination that the counts naming Derrick as a defendant should be dismissed with prejudice in large part on the following finding of fact:

> In the months following [Derrick's] appearance before the grand jury and the handing down of the indictment he still spent about 50 percent of his time assisting the prosecution with documents and their other needs and at no time did he ever appear to have been warned or in any way alerted to the fact that he was walking with the enemy and that everything he might be doing would ultimately come back to haunt him.

■ However, in the period following his appearance before the grand jury, his efforts to assemble documents and other information were attributable to compliance by him with the direction of CSC, given for the corporate purposes of CSC. The records produced by Derrick's efforts after all belonged to the corporation and Derrick consequently had no Fifth Amendment privilege with respect to them. *E.g. Bellis v. United States,* 417 U.S. 85, 88–92, 94 S.Ct. 2179, 2183–2185, 40 L.Ed.2d 678 (1974); *United States v. White,* 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *Dreier v. United States,* 221 U.S. 394, 31 S.Ct. 550, 55 L.Ed. 784 (1911).

■ Finally, of course, even had violation of Fifth Amendment rights occurred, the proper sanction would not be the total dismissal with prejudice of the pertinent counts of the indictment. Suppression at trial of any materials obtained through violations of his Fifth Amendment rights would suffice. *See United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966) ("Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.").

**D.** *The counts under the RICO statute.*

■ Here we confront the most troublesome point raised by the defendants in their successful assault below on the fifty-seven counts making up the indictment. The factual situation presents one claim of an alleged bribery occurring outside the period of limitations and, therefore, not subject to prosecution together with the several charges of wire fraud and mail fraud. The list of crimes which may be considered in determining whether the two predicate offenses necessary to make out a RICO offense have been alleged does not extend to false claims under 18 U.S.C. § 287.

We entertain some doubt that Congress ever contemplated the extension of the RICO statute to include a situation where one of the predicate offenses, separated in character and by a long time period, could combine with a set of closely related wire fraud and mail fraud claims essentially representing subdivisions of a single on-going illegal act to meet the predicate requirements of so serious a statute. The defendants do not immediately appear to fit a category against whom the act was generally considered to be directed. It would be tempting indeed to conclude that, although the act does include mail fraud and wire fraud among possible predicate offenses, nevertheless the omission from that category of the false claims statute, combined with the consideration relied on by the district judge in another context, namely, the apparent complete overlap under the facts the government expects to prove between the false claims statute and the wire fraud and mail fraud acts, evidenced a congres-

sional intent to foreclose consideration of the putative wire fraud and mail fraud offenses for RICO purposes.

That approach would reduce the matter to one involving but a single predicate offense and, therefore, render RICO inapplicable. However, the approach, tempting as it is, is not at all appropriate in the present stage of the proceedings. We cannot presently tell for certain how the prosecution may develop. Nothing in the RICO act clearly precludes the prosecutions here, the indictments having been carefully tailored, technically at least, to meet the requirements of the RICO act. If legislatively mandated limitations on RICO's applicability of the sort alluded to above are to be ascribed to Congress, it should not happen in a vacuum but rather only after a fully developed factual record has been made and the necessary precondition to a real determination, namely, a conviction, is before us.

■■■ The district court was also impressed with an argument which we find unsound insofar as the thrust of the RICO act is concerned. The RICO "enterprise" was identified in the indictment as the Infonet Division of CSC, an organization which had no corporate existence separate and apart from that of CSC itself. The district judge took the position that the Infonet Division could not qualify as an enterprise in view of its corporate non-status.[15] However, 18 U.S.C. § 1961(4) defines "enterprise" as follows:

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

Possession of the characteristics of a legal entity hence is not necessary to make out an "enterprise." At the very least, Infonet, having a substantial number of CSC employees working within the grouping or division known by its name, constitutes a "group of individuals associated in fact although not a legal entity."

■■■ Nor are we impressed by the contention that Infonet could not be an "enterprise" because it could not be treated as a "person," defined in 18 U.S.C. § 1961(3) as an individual or entity capable of holding a legal or beneficial interest in property. We may assume that a corporate division may not take formal legal title to property, but beneficial, informal rights assigned by the corporation to the division to assist in the conduct of its affairs appear to constitute informal beneficial interests. We may also assume that Infonet, not being an individual, and "not a legal entity" cannot be a "person" for RICO purposes. Nevertheless, nothing in the statute requires that an "enterprise" be a "person." The use of the word "person" in 18 U.S.C. § 1962 is confined to identification of whoever is charged with "prohibited activities." Counts 1 through 3 of the indictment do not name Infonet as a defendant. Those named are all individuals or CSC, a corporate entity.

■■■ There is, however, the remaining problem, restricted to CSC, of whether Congress ever intended, in 18 U.S.C. § 1962, that the statute prohibit activities by a person where the activities are described as occurring with any enterprise when there was identity between the person, on the one hand, and the enterprise, on the other. We conclude that "enterprise" was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit, and, failing that, to punish. To be sure, the analogy between individuals and fictive persons such as corporations is not exact. Still, we would not take seriously, in the absence, at least, of very explicit statutory language, an assertion that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon. A corporation, in common parlance, is not regarded as distinct from its unincorporated divisions either. Bearing in mind that lenity applies even in RICO cases, *United*

---

15. For a similar approach taken in the analogous circumstances of Sherman Act conspiracies, *see* M. Handler and T. A. Smart, *The*

*Present Status of the Intracorporate Conspiracy Doctrine,* 3 Cardozo L.Rev. 23 (1981).

*States v. Anderson,* 626 F.2d 1358, 1370 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), we have decided that Counts 1 through 3 were properly dismissed, with prejudice, as to CSC. Counts 1 and 2 alleged participation in the affairs of an enterprise, namely the Infonet Division. Count 3 alleged use and investment of racketeering income in the operation of the Infonet Division, an enterprise. Nevertheless, Counts 1 and 2, inasmuch as they charged individual defendants as well as CSC, remain outstanding as to all save CSC.[16]

The contention that the enterprise, the Infonet Division, was not benefitted or advanced by the racketeering activity arose, of course, from the unfortunate, inexact language in the opinion in *United States v. Webster,* 639 F.2d 174 (4th Cir. 1981), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). Subsequently, the language "benefitted or advanced" was disavowed following rehearing. *United States v. Webster,* 669 F.2d 185 (4th Cir. 1982), etc. at 186–187. Since that consideration alone eliminates the support for defendants' position with respect to Counts 1 and 2, it makes unnecessary any discussion of the further government claim that it should, at any rate, not suffer dismissal of the indictment but be permitted to prove at trial that the affairs of the Infonet Division had in fact been benefitted or advanced through the racketeering activity.

For all the foregoing reasons, the decision below is reversed and the case is remanded with directions to reinstate each of the fifty-five counts (Counts 1 and 2, 4 through 37, and 39 through 57). Count 3 should remain dismissed with prejudice, as should the dismissal as against CSC of Counts 1 and 2. Count 38, the dismissal of which the government has not appealed, should, also, not be exhumed.

REVERSED AND REMANDED.

16. Count 3 named only CSC, and so was properly dismissed *in toto.*