**Anthony AMENDOLARE et alia, Plaintiffs,**

**v.**

**SCHENKERS INTERNATIONAL FORWARDERS, INC. et alia, Defendants.**

**No. CV–87–3023.**

United States District Court, E.D. New York.

Aug. 24, 1990.

McCoy Aggoglia Beckett & Fassberg, Mineola, N.Y., for plaintiffs.

Milgram Thomajan & Lee, P.C., New York City, for defendant Schenkers.

Stephen H. Kahn, Fort Lee, N.J., for Local 851.

Ira Drogin, New York City, for Local 295.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiffs, members of defendant Local 295 of the International Brotherhood of Teamsters ("Local 295"), commenced this action to recover for injuries caused by defendants' alleged bribery, fraud, and extortion, which allegedly resulted in the termination of plaintiffs' employment. The amended complaint alleges causes of action for negligence, breach of contract, tortious interference with contractual agreements, fraud, termination of employment, and violations of the Racketeering Influenced and Corrupt Organizations ("RICO") Act.

This matter is before the Court on the motions of defendants Local 295 of the International Brotherhood of Teamsters ("Local 295"), Local 851 of the International Brotherhood of Teamsters ("Local 851"), and Harry Davidoff to dismiss all of plaintiffs' claims against them pursuant to Rule 56 of the Federal Rules of Civil Procedure. Local 851 and Davidoff both assert that plaintiffs have failed to produce sufficient evidence connecting plaintiffs' injury to the conduct of either party to avoid summary disposition of the cases against them. Defendant Local 295 asserts that plaintiffs cannot maintain a RICO claim which is solely premised upon vicarious liability stemming from the conduct of their former president, defendant Frank Calise. Local 295 has also moved to dismiss the pendent

state law claims as preempted by federal labor law.

In 1985, many of the defendants named in the current civil action, including Frank Manzo, Harry Davidoff, and Frank Calise, were indicted for violations of RICO. A trial was subsequently held before Judge Joseph McLaughlin of this Court. Defendant Schenkers International Forwarders, Inc. ("Schenkers") was not named in the indictment, although many of the events described herein were the subject of the transactions described in the criminal proceedings.

The complaint in this action was filed in August 1987 and was amended in October of that year. Defendants Schenkers and Manfred Engst moved in June 1988 and in April 1989 to dismiss plaintiffs' RICO claims upon the grounds that plaintiffs had failed to state a valid claim upon which relief may by granted, that plaintiffs had not suffered a RICO injury, and that the applicable statute of limitations barred the complaint. By oral decision on June 28, 1988, and by Memorandum and Order dated December 27 1989, this Court denied those motions in their entirety.

## BACKGROUND

The following is undisputed except as noted. (Matters described as "alleged, "contended," or "claimed" are the subject of dispute.) Plaintiffs Anthony Amendolare, Laurence Dexter, Frank Rudtner, and Joseph Siano were members of Local 295 and were employed by defendants Hi's Airport Service, Inc. ("Hi's"), Holsten Air Service, Inc. ("Holsten"), and Schenkers. These defendants were at all relevant times involved in the air freight and freight forwarding industry at JFK International Airport. Schenkers is an international air and ocean freight forwarder and customs broker. During the period in question, Schenkers maintained an office at JFK Airport where its services included clearing cargoes being imported into the United States and arranging for the export of cargoes to foreign countries. One of Schenkers' principal clients was IBM. Defendant Manfred Engst was employed by Schenkers and held the position, among others, of vice president of corporate traffic. Defendant Heino Benthin owned and operated both Hi's and Holsten, which plaintiffs claim had intermingled assets and equipment.

Defendant Frank Calise was the president of Local 295 from at least 1980 to 1985. Between approximately 1980 until 1987, defendant Harry Davidoff was the vice president of Teamsters Local 851. The Local 851 welfare and pension funds provide benefits for the members of both Local 851 and Local 295. Sharon Moskowitz, Harry Davidoff's daughter, is the current administrator of these pension and welfare funds.

In 1977 Schenkers contracted out its warehousing work to Sherwood Trucking ("Sherwood"). In order to gain permission to contract out this work, Schenkers entered into a letter agreement with Local 295. This agreement provided that Sherwood be deemed a co-employer for the purpose of all labor relations policies relating to the handling and documenting of its freight with Schenkers.

When Schenkers terminated its contract with Sherwood Trucking in 1980 and arranged to subcontract its warehouse work to Hi's and Holsten, Schenkers entered into another co-employment agreement with Local 295. The agreement with respect to Hi's contained the same terms as the contract formerly entered into regarding Sherwood and specifically stated that Hi's was "for all purposes deemed to be a co-employer" with Schenkers. The agreement further provided that Schenkers would remain as a standby guarantor, that Hi's would perform all of its obligations under the Schenkers–Local 295 contract, and that, in the event the Hi's/Schenkers arrangement was terminated, Hi's employees who previously had been employed by Schenkers would revert to the Schenkers payroll. Plaintiffs claim that Schenkers' relationship with Holsten was also governed by a co-employer agreement.

The amended complaint alleges that beginning in 1978 various defendants combined and conspired to commit a pattern of

racketeering activity in violation of 18 U.S.C. §§ 1951 and 1952, and 29 U.S.C. § 186. Plaintiffs further contend that defendants Schenkers, Engst, Benthin, Calise, Davidoff, and the union defendants formed an enterprise that conducted criminal activities including bribery, extortion, attempts to extort money and valuable contractual rights from the air freight business at JFK Airport, and illegal payments to arrange the termination of plaintiffs' employment. *See, e.g.,* ¶ 74.

The complaint further alleges that beginning in late 1982 Schenkers told Benthin and Calise, president of Local 295, and Harry Davidoff, vice president of Local 851, that it wished to reduce its labor force. All of these defendants at that time agreed and conspired to extort, bribe, and pay sums of money in order to release Schenkers from certain contractual rights and to ensure labor peace. ¶¶ 81–83. To further said agreement, Schenkers and Engst are alleged to have made a series of payments through Benthin that resulted in the termination of plaintiffs' employment. *Id.* This Court's December 1989 decision concluded that "plaintiffs have raised substantial issues of fact over these allegations which if established at trial would constitute a pattern of predicate acts for purposes of RICO." Slip op. at 11.

Although plaintiffs were not members of Local 851 and not party to any collective bargaining agreements involving Local 851, the parties have submitted evidence linking both Davidoff and Local 851 to the RICO payoff scheme that resulted in their termination, as well as similar schemes involving the termination of union workers at other air freight companies. According to a letter sent to Judge Constantino by the U.S. government in regard to the sentencing of Harry Davidoff and submitted by Local 851 in support of its motion, Davidoff has a long and well-documented association with the Luchese crime family and other members of organized crime. According to the letter, Davidoff used his control over Locals 851 and 295 to further his criminal activities and had sold out both unions by permitting union layoffs in return for payoffs. This description is confirmed by the trial deposition of defendant Heino Benthin. According to Benthin, in February 1989, Schenkers made a $50,000 payoff to defendants Frank Manzo and Frank Calise in order to lay off six Local 295 members. Benthin further testified that Frank Manzo told him that Davidoff was to get $35,000 or the "lions share" of that amount. Moreover, there is evidence that this termination payoff was not an isolated incident. Benthin testified that with respect to at least two other air freight companies, Randy International and TAT Airfreight, Davidoff was involved in a payoff arrangement in which top union officials consented to the termination of union members.

### The Government's Civil RICO suit

Earlier this year, the United States Attorney for the Eastern District of New York filed a civil RICO suit against Local 295 and Local 851, the executive boards of both unions, Manzo, Calise, Davidoff and a number of other past and current union officials. Among these, the complaint names Anthony Calagna, the president of Local 295 who replaced Calise in 1985 (both men are allegedly members of the Luchese crime family), Michael Urso–Pernice, the vice president of Local 295, and Robert Reinhard, the recording secretary of Local 295. The complaint alleges that the criminal activity of Calise, Manzo, and Davidoff was aided and abetted by both unions and members of the executive boards, who used their positions as officers of the unions to permit, protect, or conceal the conduct.

### DISCUSSION

#### Davidoff and Local 851 Motions

■ The summary judgment motions of Harry Davidoff and Local 851, both of whom claim that there is insufficient evidence linking them to the injury suffered by plaintiffs, must be denied. As discussed above, there is sufficient evidence directly linking Davidoff, the vice president of Local 851, with the Schenkers' kickback scheme which resulted in plaintiffs' termination. Contrary to defendants' assertions that this evidence constitutes hearsay,

Manzo's statement to Benthin implicating Davidoff in the payoff would be admissible under Fed.R.Evid. 801(d)(2)(E) as a statement by a co-conspirator made during the course of and in furtherance of the conspiracy. *See United States v. Salerno*, 868 F.2d 524, 535–36 (2d Cir.1989).[1]

■ Moreover, there is considerable evidence that Davidoff and Local 851 played a central role in the larger racketeering scheme to extort bribes and kickbacks from various air freight companies in JFK airport at the expense of union members. Rule 404(b) of the Federal Rules of Evidence permits proof of other crimes or acts to show proof of opportunity, intent preparation, plan or knowledge. Under the "inclusionary" approach followed in this circuit, "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity ... as long as it is relevant to some disputed issue in the trial and satisfies the probative-prejudice balancing test of Fed.R. Evid. 403." *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir.1986) (citations omitted). Where, as here, there is evidence that a defendant engaged in a pattern or practice of similar crimes that were part of the same conspiracy, the courts in both criminal and civil actions have allowed proof of other crimes to help establish a defendant's involvement in the particular crime or scheme in question. *See, e.g., Brennan*, 798 F.2d at 589–90; *Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 320 (3d Cir.1981); *Morley v. Cohen*, 888 F.2d 1006, 1011 (4th Cir.1989).

### RICO Claims Against Local 295

Local 295 asserts that plaintiff's RICO claims against it must be dismissed on the grounds that (a) the union is impermissibly characterized as both a "person" and an "enterprise" and (b) plaintiffs cannot make the union vicariously liable for the wrongful conduct of its president, Calise, under RICO.

Plaintiffs' fifth cause of action asserts that Manzo, Calise, Davidoff, Benthin, and other defendants formed a group of persons that constituted a "de facto" RICO enterprise which furnished the vehicle for the common purpose of criminal activities. Local 295 and Local 851 allegedly were "persons associated with the Enterprise" and conducted or participated in the conduct of the enterprise through a pattern of racketeering activity or a collection of unlawful debts. The fifth cause of action explicitly defined the RICO enterprise as "a group of individuals associated in fact, although not a legal entity as defined in 18 U.S.C. § 1961(4)."

In contrast, plaintiffs' sixth cause of action specifies Local 295 as the "enterprise" under section 1961(4): "Said Enterprise is a legal entity and conducted its affairs through a pattern of racketeering activity or collection of unlawful debt. All of the aforementioned aspects of racketeering activity alleged in this complaint were and had been organized and conducted through the offices of Local 295." All of the other defendants "other than Local 295" are defined as "persons" employed by or associated with this enterprise.

Plaintiffs' two RICO claims implicitly rely on 18 U.S.C. § 1962(c) in order to find the unions and other defendants liable. That section, which is tracked by the fifth and sixth causes of action, provides:

> "It shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

---

1. If Benthin testifies at the civil trial, his testimony regarding Manzo's implication of Davidoff would thus be admissible. If Benthin is not available, plaintiffs' attempt to introduce the transcript of his prior testimony would encounter a potential double hearsay problem. However, to the extent Benthin's prior testimony implicated himself in the same criminal scheme, it would probably be admissible as a statement against interest pursuant to Fed.R. Evid. 804(b)(3). *See Int'l Distributing Corp. v. American District Telegraph Co.*, 569 F.2d 136, 138 (D.C.1977).

The clear majority of the circuits have determined that both statutory language and legislative policy require a complaint under section 1962(c) to distinguish between the "enterprise" and the defendant "person" who is conducting the enterprise in a prohibited manner. *See, e.g., Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384, 400 (7th Cir.1984); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982); *but see United States v. Hartley*, 678 F.2d 961, 988 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). As the Second Circuit explained in *Bennett v. U.S. Trust Co.*, 770 F.2d 308 (2d Cir.1985):

> "[R]equiring a complaint to distinguish between the enterprise and the person conducting the affairs of that enterprise in the prohibited manner is supported by the plain language of section 1962(c), which clearly envisions two entities. Moreover, requiring a distinction between the enterprise and the person comports with legislative intent and policy. Such a distinction focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.

770 F.2d at 315.

■ Although a single entity may not simultaneously be both the "person" and "enterprise" under section 1962(c), there is no prohibition against a single entity being both the "person" and one of a number of entities comprising the "enterprise." The term "enterprise" is defined under section 1961(4) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Accordingly, in *Cullen v. Margiotta*, 811 F.2d 698 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987), the Second Circuit concluded that "the very terms of section 1962(c) appear to envision that the same entity may be both the RICO 'person' and a member of the 'enterprise' for the section speaks of a 'person . . . associated with any enterprise.' Thus, although we rejected in *Bennett* the notion that an entity may be

deemed 'associated with' only itself, there is neither a conceptual nor a doctrinal difficulty in positing an entity associated with a group of which it is but a part." 811 F.2d at 730; *see also Connors v. Lexington Insurance Co.*, 666 F.Supp. 434, 448 (E.D. N.Y.1987).

■ Plaintiffs' fifth cause of action, which alleges that the two unions are two "persons" associated with a larger "de facto" enterprise, is clearly acceptable under the above analysis. The sixth cause of action, at least when examined independently, also states a valid RICO claim. Although Local 295 is now defined as the "enterprise," the allegation clearly excludes that union from all of the other defendants who are "persons employed by or associated by this Enterprise." Nowhere does the sixth cause of action purport to impermissibly characterize Local 295 as both the enterprise and a person.

As Local 295 points out, the sixth cause of action is plainly inconsistent with the fifth cause of action. However, the fact that Local 295 is identified as as a "person" in one claim and an "enterprise" in the other does not contravene the pleading requirements of section 1962(c). The Federal Rules of Civil Procedure specifically permit a party to set forth alternative and inconsistent claims. Fed.R.Civ.P. 8(e)(2) provides that "[a] party may set forth two or more statements of a claim or defense alternatively or hypothetically," and "may also state as many separate claims or defenses as the party has regardless of consistency." *See also* 2A J. Moore, *Moore's Federal Practice* ¶ 8.31 (2d ed.1987). It would thus be inappropriate to dismiss either of the RICO claims on these grounds.

Plaintiffs' fifth cause of action alleges that Calise and other individuals extorted money from numerous trucking outfits through bribery and threats of union violence and that such acts were committed by Calise and Davidoff in their individual and representative capacity. The complaint further alleges that the bribery and illegal payments made to union officials to insure labor peace and to allow unlawful termi-

nation were intended to and did benefit the unions, as the money gained was used for union purposes. Plaintiffs point to the recent civil action brought by the U.S. Attorney against both Local 295 and Local 851 and their executive boards as evidence that the entire union hierarchy shared complicity in, or at least knowledge of, the criminal activities of Calise and Davidoff, and as indicating that both unions benefited monetarily from the the ·RICO conspiracy. However, Local 295 asserts, and plaintiffs essentially concede, that there is no direct evidence that the illegal payoffs and bribes went into union funds and that the civil liability of Local 295 is primarily based on vicarious liability for the actions of Calise, the union president.

Defendant Local 295's primary assertion, that vicarious liability may not be employed to render a corporate entity or labor union liable under RICO, is plainly incorrect. A number of courts have addressed the question of vicarious liability under RICO but almost always in the context of whether a corporation may be named as both a person and a enterprise. Several courts have flatly held that a plaintiff may not rely on vicarious liability to circumvent the rule discussed *supra* that an "enterprise" may not be simultaneously liable as a "person" under section 1962(c). Thus, in *Schofield v. First Commodity Corp.*, 793 F.2d 28, 32–33 (1st Cir.1986), the First Circuit rejected plaintiff's alternative argument that the principles of *respondeat superior* should operate to make the "enterprise" brokerage firm liable for the criminal acts of its brokers. However, many courts have indicated that vicarious liability is at least potentially available to hold the "enterprise" liable so long as the enterprise is not the innocent "victim" or "conduit" of the criminal enterprise. *See e.g., Rush v. Oppenheimer Co.*, 628 F.Supp. 1188, 1196 (S.D.N.Y.1985).

More important, as noted above, plaintiffs' fifth cause of action only names Local 295 as a defendant "person" and not as an "enterprise." In these circumstances, the question is therefore whether a corporation or union that is named as a defendant "person" but not as an "enterprise" may be held vicariously liable under section 1962(c) for the intentional acts of its employees. Those courts that have considered this precise question have answered in the affirmative. *See, e.g., Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir.1989) (*respondeat superior* appropriate so long as RICO claim is not ·brought against the enterprise itself); *Connors, supra*, 666 F.Supp. at 453 (same).

Many federal courts have added a judicial gloss to the doctrine of vicarious liability in the context of RICO. Some courts have found it appropriate to distinguish between "aggressor" corporations that are central figures in the unlawful scheme and "conduit" corporations that unknowingly facilitate the illegal behavior. *Gruber v. Prudential–Bache Securities, Inc.*, 679 F.Supp. 165, 180 (D.Conn.1987); *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 835 (D.C.Ill.1985); *Dakis v. Chapman*, 574 F.Supp. 757, 766 (N.D.Ca. 1983); *see also* Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Borg*, 58 Notre Dame L.Rev. 237, 323 (1982). Whereas either category of corporation would be potentially liable under the *common law* doctrine of respondeat superior for the acts of their employees committed within the scope of their employment, these cases have declined to subject the unwitting "conduit" corporations to RICO liability.

As the Seventh Circuit explained in *Haroco v. American Nat'l Bank and Trust Co.*, 747 F.2d 384, 401 (7th Cir.1984), "it would make little sense to hold a corporation liable under RICO for the misconduct of lower level employees, at least where it appears that the corporation is a passive instrument or even a victim of the racketeering activity." *See also Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20, 24 n. 9 (N.D.Ill.1982). Several courts have thus determined that vicarious liability under RICO is only permitted when the defendant corporation can be characterized as the "central" or "controlling" figure in the RICO enterprise. *Haroco, supra*, 747 F.2d

at 401[2]; *Gruber, supra,* 679 F.Supp. at 181. Whether an entity should be characterized as a "passive conduit" or a "central figure" is also contingent on the complicity of high level officers, *compare Bernstein v. I.D.T. Corp.,* 582 F.Supp. 1079, 1083 (D.Del.1984) (liability where leading officers and directors involved) and *Fed. Sav. & Loan Ins. Corp. v. Shearson–American Express,* 658 F.Supp. 1331, 1342 (D.P.R. 1987) (same) *with Dakis, supra,* 574 F.Supp. at 760 (no liability where low level agents involved).

In *Gruber v. Prudential, supra,* 679 F.Supp. at 181, the district court summarized these requirements:

> "What constitutes a 'central figure' will vary with the factual circumstances of each case. In order to establish corporate liability under section 1962(c) ... it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity. Once knowledge or reckless indifference at this high corporate level has been determined, the court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefited from the racketeering activity."

Plaintiffs have raised at least a material issue of fact with respect to whether Local 295 constituted a "central figure" within the overall RICO conspiracy. There is substantial evidence that Calise, the union president, was extensively engaged in both the overall RICO conspiracy and many of the individual predicate acts of extortion and bribery. Moreover, the record indicates that Calise and Davidoff (and, according to the government's recent complaint, other union officials) established union policies that put union resources and strategy at the heart of the criminal conspiracy to dominate the air freight business in Kenne-dy Airport. Because the threat and actuality of union strikes and picket lines was a central element in the ongoing conspiracy to extort money from various air freight companies, both Local 295 and Local 851 may be characterized as "aggressor" entities that victimized other businesses.

Despite this finding, defendants have raised a significant issue as to whether plaintiffs have adequately satisfied two central predicates of liability under the scope of employment doctrine, namely, whether Calise was acting within the "general area" of his authority and whether Local 295 obtained any benefit from the acts of its agent Calise. Under the Restatement, the conduct of a servant is within the scope of employment if it (a) is the kind he is employed to perform, (b) occurs substantially within the authorized time and space limits, and (c) is actuated, at least in part, by a purpose to serve the master. Restatement (Second) of Agency § 228(1), at 504 (1957). However, the criminality of an act does not alone prevent it from falling within the scope of employment. *Id.* § 231, comment b, at 512. Moreover, the acts of an agent motivated partly by self-interest—even where self-interest is the predominant motive—lie within the scope of employment so long as the agent is actuated by the principal's business purposes "to any appreciable extent." *Id.* § 236 & comment b, at 523–24; *see also Local 1814, Int'l Longshoremen's Assoc. v. NLRB,* 735 F.2d 1384, 1395 (D.C.Cir.1984).

In debating the scope of employment issue, both parties rely heavily on *Local 1814 v. NLRB, supra,* a non-RICO case in which the Court of Appeals for the District of Columbia was called upon to determine whether a union was civilly liable for the criminal acts of its president. In *Local 1814,* the president and vice president of a union had consummated an illegal kickback scheme with a shipbuilding company in which the company had agreed to the unionization of its shop and payments to the union officials in return for a union

---

**2.** *Haroco* addressed the question of whether an "enterprise" could be vicariously liable and concluded that it could under section 1962(a), but not section 1962(c).

promise to steer other business to the company.

The Circuit Court concluded that the union president's dealings with the company were within the "general area" of his authority, particularly given that the kickback scheme tended to accomplish the authorized purpose of extending the union's membership. The court explained that the existence of an agency relationship was completed by the fact that the president had the dual motive of his own pecuniary advantage and the advancement of the representation objectives of his union. *Id.* at 1395. The court further noted that the local had derived substantial advantages from the unlawful arrangement even in the absence of any evidence that the union itself received any of the money paid to the president. As the D.C. Circuit explained:

> "In this regard, it is crucial to distinguish the interests of the Union itself from those of the employee members of the Union—who themselves may not have obtained any new job opportunities out of the payment arrangement. The Union benefited from ... the extension of the Union's representation of ship workers [and from] the associated financial inflow of dues and related fees into its treasury any pension fund. Finally, the Union benefited generally from the extension of its strength and authority on the New Jersey–New York waterfront."

*Id.* at 1396.

■ Examination of the same factors in the present case reveals that plaintiffs have not presented sufficient evidence that Calise was acting within the scope of his authority or that his actions were at least partially benefiting his union. While Calise certainly had "general authority" to negotiate arrangements with various employers, it can hardly be argued that he had any authority to arrange a kickback scheme that permitted the unlawful termination of plaintiffs' jobs and permitted Schenkers to hire non-union personnel when new work was available. Here, there is no evidence that "the kickback scheme was a means to an authorized end." *Local 1814*, 735 F.2d

at 1395. Nor is there more than minimal evidence that Local 295 actually benefited from the criminal acts of Calise and other top officials. The criminal trial testimony submitted by plaintiffs themselves describes a widespread criminal conspiracy in which Calise, Davidoff, and other defendants repeatedly extracted payoffs from various air freight companies in return for agreements to terminate the employment of union members or for agreements not to seek the unionization of non-union shops. Thus, in direct contrast to the situation in *Local 1814*, Local 295 suffered a loss of membership and was denied an opportunity to expand its influence and to collect new dues and fees. Whatever "strength and authority" the union gained through the criminal acts of Calise, it is therefore difficult to infer that Calise was acting even partially for the benefit of the union, as opposed to the extended criminal enterprise.

■ Although plaintiffs' scope of employment argument is highly problematic, they can potentially recover from Local 295 under the agency doctrine of apparent authority. Unlike the scope of employment doctrine, a principal may be liable for the acts of an agent acting with apparent authority even where there is no benefit to the principal. As the comment to the Restatement explains with respect to fraud:

> "[L]iability is based upon the fact that the agents' position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him."

Restatement (Second) of Agency § 261, comment a. In this case, Calise and possibly other union officials can be said to have acted with apparent authority toward plaintiffs when they sanctioned their dismissals and later indicated there were no new employment opportunities.

It is well-settled that agency doctrines may be employed to find labor unions liable for the acts of their agents and that such doctrines should be expansively construed.

*Local 1814 v. NLRB, supra,* 735 F.2d at 1394. The apparent authority doctrine of agency law has been applied under the National Labor Relations Act as an independent theory for the attribution of responsibility to a union. *See NLRB v. Local 3, Int'l Bhd. of Elect. Workers,* 467 F.2d 1158, 1160 (2d Cir.1972); *Local 1814, supra,* 735 F.2d at 1398 n. 21. Moreover, permitting the apparent agency doctrine in this instance would not contravene the language or policy underlying RICO. The federal policy underlying RICO is "to cope with the infiltration of legitimate businesses [by organized crime]." *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). So long as this strand of agency doctrine is not employed against passive entities that have been victimized by low-level employees, as discussed *supra,* the imposition of liability on an organization for its negligence or acquiescence in allowing criminal activities would tend to promote this policy objective.

In *Hydrolevel Corp. v. ASME,* 635 F.2d 118 (2d Cir.1980), the Second Circuit confronted the similar issue of whether a trade association's liability for treble damages under the antitrust laws could be based on the actions of agents acting within their apparent authority. The court held that, at least with respect to intentional torts such as fraud and misrepresentation, a principal would be liable under this doctrine. As the Second Circuit explained, "[i]mposing liability on the principal will induce greater care to prevent misconduct by agents occupying especially sensitive or responsible positions that invite reliance...." *Id.* at 125.

In affirming the Second Circuit's decision, the Supreme Court in *ASME v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), stressed the prophylactic value of permitting civil liability on the basis of apparent authority:

> "A principal purpose of the antitrust private cause of action ... is, of course, to deter anticompetitive practices.... But if [in addition to the personal liability of the agents] ASME is civilly liable for the antitrust violations of its agents acting with apparent authority, it is much more likely that similar antitrust violations will

not occur in the future. '[P]ressure [will be] brought on [the organization] to see to it that [its] agents abide by the law.'"

456 U.S. at 572, 102 S.Ct. at 1945, (quoting *United States v. A & P Trucking Co.,* 358 U.S. 121, 126, 79 S.Ct. 203, 207, 3 L.Ed.2d 165 (1958)).

At least one federal court has relied on *Hydrolevel* to hold a corporation vicariously liable under RICO. In *Fed. Sav. & Loan Ins. Corp. v. Shearson–American Express,* 658 F.Supp. 1331 (D.P.R.1987), high level members of Shearson were allegedly responsible for carrying out the RICO enterprise. The court concluded that "[t]he remedial purposes of §§ 1964 and 1962(c) are consistent, in this case, with application of *respondeat superior* as a basis for liability. As stated in *ASME v. Hydrolevel* ... if the principal is liable, it is much more likely that similar violations will not occur in the future since pressure will be brought on the organization to see to it that its agents abide by the law." *Id.* at 1342. Under the same rationale, plaintiffs, who appear to have been directly injured by the criminal actions of Calise when he sanctioned their dismissals, should be permitted to recover from Local 295 on the basis of vicarious liability.

### Pendent Claims

In addition to their RICO claims, plaintiffs' complaint seeks damages against the unions and corporate defendants for negligence in allowing their agents to induce the breach of contract through kickbacks and seeks damages against all defendants for breach of contract, tortious inducement to breach, fraud and misrepresentation, and emotional distress due to the tortious interference with their employment. Local 295 asserts that these pendent state law claims must all be dismissed on the grounds of preemption.

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may

be brought in any district court of the United States having jurisdiction of the parties." In *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that section 301 authorized the federal courts to create a national body of federal law for the enforcement of collective bargaining agreements, while in *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Court established that federal, and not state law, must be employed in adjudicating section 301 claims.

In *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Court defined the range of state claims that are preempted by section 301. In holding that an employee's state law tort action against his employer for the bad-faith handling of disability benefits was preempted by federal law, the Court ruled that a tort claim "inextricably intertwined with consideration of the terms of the labor contract" is preempted by section 301. 471 U.S. at 213, 105 S.Ct. at 1912. As that Court elaborated:

> "Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such question arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract."

471 U.S. at 211, 105 S.Ct. at 1911; *see also Electrical Workers v. Hechler*, 481 U.S. 851, 859, 107 S.Ct. 2161, 2166, 95 L.Ed.2d 791 (1987) (test is whether the state law claim "is sufficiently independent of the collective bargaining agreement to withstand the preemptive force of § 301.").

Plaintiffs' state law claims for negligence, tortious interference with contract, breach of contract, fraud, and emotional distress all center around plaintiffs' allegedly wrongful dismissal in violation of their union employment contracts with Hi's, Holsten, and Schenkers and in particular in violation of the guaranteed work clause provision of these contracts. Because these claims directly implicate the collective bargaining agreements entered into by the union and corporate defendants in this case, they are preempted by section 301.

Where an employee has not exhausted his contractual remedies to challenge his termination, he may only bring a section 301 suit against his employer if the employee can prove that the union as a bargaining agent breached its duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1966). If Local 295's contention that plaintiffs have failed to employ any existing grievance mechanisms is correct, plaintiffs would need to engage in such a "hybrid" section 301 suit.[3]

Local 295's further contention that plaintiffs' section 301 claims against its union and employers are barred by the statute of limitations need not be now decided. Although the statute of limitations for hybrid section 301 claims is generally only six months, *see Legutko v. Local 816, Int'l Bhd. of Teamsters*, 853 F.2d 1046 (2d Cir. 1988), the Court notes that the limitations period does not begin to accrue until plaintiffs knew or reasonably should have known that a breach of the duty of fair representation had occurred. *King v. New York Telephone*, 785 F.2d 31, 34 (2d Cir. 1986).

For the foregoing reasons, defendants' motions for summary judgment are denied with respect to the RICO claims. The motion to dismiss the state law claims is granted, but plaintiffs are granted leave to file an amended complaint asserting a sec-

---

**3.** The Court's conclusion that plaintiffs' state law claims are preempted is consistent with its December 1989 Decision and Order, which refused to characterize plaintiffs' RICO claims as a hybrid labor relations case. As the Court found in that decision, plaintiffs have clearly alleged valid RICO claims, based on evidence of a scheme of extortion and bribes made in violation of 29 U.S.C. § 186. In contrast, plaintiffs' state law causes of actions are apparently based on common law breach of contract and tort claims.

tion 301 claim within thirty days of the date of this decision.

SO ORDERED.