Daniel J. SHARKEY, Plaintiff,

v.

LASMO (AUL LTD.) and Ultramar Corporation, Defendants.

No. 94 Civ. 4699 (WCC).

United States District Court, S.D. New York.

Jan. 21, 1998.

Silver Golub & Teitell, Stamford, CT (David S. Golub, of counsel) and Cuddy &

Feder, White Plains, NY (Thomas R. Beirne, of counsel), for Plaintiff Daniel J. Sharkey.

Fulbright & Jaworski, L.L.P., New York City (Ralph C. Dawson, of counsel) and Fulbright & Jaworski, L.L.P., Houston, TX (A.J. Harper, II, of counsel), for Defendant Lasmo (AUL Ltd.).

Dooley Herr & Williams, LLP, Visalia, CA (Daniel H. Williams, III, of counsel) and Bleakley Platt & Schmidt, White Plains, NY (Timothy J. Rooney, Jr., of counsel), for Defendant Ultramar Corp.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Daniel Sharkey brings this action against defendants Lasmo (AUL Ltd.) ("Lasmo") and Ultramar Corporation ("Ultramar") pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Sharkey, a Vice President and Manager for Ultramar Energy Limited ("UEL") during all relevant times, alleges that due to his age, he was denied employment opportunities by defendants at the Lasmo plc companies created through a merger and reorganization involving UEL, and was ultimately terminated. Specifically, Sharkey alleges that he was offered a less favorable employment package than were two younger UEL executives, and that defendants failed to offer him other available positions for which he was qualified, before terminating his employment. Defendant Lasmo now moves for summary judgment pursuant to Fed.R.Civ.P. 56. Both Sharkey and defendant Ultramar oppose Lasmo's motion.

### BACKGROUND

The facts concerning this action are set forth in the Court's prior opinion, *Sharkey v. Lasmo*, 906 F.Supp. 949, 953–54 (S.D.N.Y. 1995), and familiarity with that decision is presumed. The facts pertinent to the instant

motion are as follows. Plaintiff was terminated on July 31, 1992, pursuant to a merger and reorganization by Lasmo plc of Ultramar plc and its subsidiaries. Lasmo plc had acquired Ultramar plc and UEL, among others, in late 1991 or early 1992 through a hostile takeover. UEL was an affiliate of defendant Lasmo [1] and a subsidiary of Ultramar plc. In 1992, Lasmo plc planned to consolidate various Ultramar plc businesses into a new corporation, namely, defendant Ultramar.[2]

In 1992, Patrick Guarino, Senior Vice President and General Counsel of both Lasmo and Ultramar and Zav Patel, Vice President of Supply for Ultramar Canada, offered executive positions with defendant Ultramar to Sharkey, who was then 59 years old, and to two other UEL Vice Presidents, Patrick McAward, who was 35, and Michael Kuzmin, who was 42. The two younger UEL Vice Presidents were offered substantially more favorable employment than was Sharkey, including (1) a sign-on bonus equivalent to one-half year's salary in the form of restricted stock in defendant Ultramar; (2) stock options in defendant Ultramar; (3) a relocation allowance up to $15,000; and (4) an "evergreen" agreement providing for automatic extension of the term of employment so that it would never be less than two years, and two years severance pay upon separation. Sharkey alleges that defendants did not offer him these incentives because defendants did not want to be bound to Sharkey for more than two years, because he was 59 years old. Sharkey also alleges defendants did not believe that he, because of his age, would risk rejecting the offer. Finally, Sharkey alleges that defendants did not offer him other available positions because of his age.

In or around June 1992, Sharkey received the initial offer of employment from Patel to work for Ultramar. The offer would require Sharkey to relocate to Canada. Later that

---

1. Defendant Lasmo is a corporation organized pursuant to the laws of the State of New York. At the time of the events in issue, defendant Lasmo, under the names of American Ultramar Limited and Lasmo (AUL Ltd.), had offices in Tarrytown, New York. Defendant Lasmo ultimately relocated its operations to Texas.

2. Defendant Ultramar is a corporation organized pursuant to the laws of the State of Delaware. Its principal place of business was, from its inception in April 1992, in Greenwich, Connecticut.

June, Sharkey met with Guarino in Guarino's office at Lasmo headquarters to discuss the offer. Sharkey advised Guarino that he would accept the offer if he was given the same package as the other two UEL Vice Presidents. Guarino refused to match Sharkey's package. In July 1992, the public offering of defendant Ultramar's stock was completed, and Sharkey's employment with UEL was terminated.

In April 1993, Sharkey filed an age discrimination charge with a local office of the Equal Employment Opportunity Commission ("EEOC") When plaintiff filed this charge, he was not represented by an attorney, and he did not consult with an attorney regarding the charge until well after it had been filed. The charge named defendant Lasmo as a respondent and asserted that "[t]wo younger men were offered better terms than [he was] and had the option of staying longer [in Canada] ... if they wished to [remain]." Sharkey Aff. Ex. D. Sharkey claimed that he had "been discriminated against because of [his] age in violation of Title VII [sic] of the Age Discrimination Act." *Id.* Sharkey did not mark the box labeled "Continuing Action" on the charge. *See id.*

Before filing the charge, Sharkey completed an Intake Questionnaire provided to him by the EEOC. Sharkey's questionnaire claims that he had been discriminated against because of his age. Sharkey Aff. Ex. E, ¶ 2. Additionally, the questionnaire shows that Sharkey had checked the "failure to hire" box, along with boxes labeled "discharge/layoff," "wages," and "involuntary retirement." *Id.* at ¶¶ 5(a), (d), (e), (f). The questionnaire also alleges that Sharkey was not offered a job which was ultimately filled by Roger Rawstron, a "new hire." *See id.* at ¶¶ 6, 8(c)—(d). In an unsworn statement attached to the questionnaire, Sharkey adds that he was "passed over [and] ... never interviewed for [a] position" which had "opened up" with "Lasmo ... [for] which [he] was qualified." *See* Ex. E.

Sharkey filed a complaint with this Court in June 1994 (the "Complaint" or "Cplt."). The Complaint alleged that Sharkey was "de-

nied employment on the basis of his age," when he was offered a "less favorable" employment package than were the two younger UEL Vice Presidents and "not offered other available positions," in violation of the ADEA. Cplt. at ¶¶ 16, 18–19.

In December 1995, the Court denied motions to dismiss the Complaint and for summary judgment by defendant Ultramar. *Sharkey,* 906 F.Supp. at 954. Our Opinion was based on the Report and Recommendation of Magistrate Judge Lisa Margaret Smith (the "Report" or "Rpt").[3] In her Report, Judge Smith had recommended denial of Ultramar's motion because, in her opinion, there existed a genuine issue of material fact whether Ultramar or Ultramar Canada, Inc. had made plaintiff the allegedly discriminatory offer of employment and, even if Ultramar Canada had made the offer, a material issue of fact existed as to "whether Ultramar Canada was a totally foreign corporation and therefore exempt from the ADEA." Rpt. at 30, 34. Specifically, Judge Smith concluded that "the trier of fact could reasonbly find that defendant Ultramar could ... be found to bear liability for the alleged discrimatory acts of Mr. Guarino," because "the efforts to staff the new business in Canada were undertaken in the interests of both .... Lasmo and Ultramar." Rpt. at 30, 32. Upon Ultramar's objections, we reviewed the case *de novo* pursuant to 28 U.S.C. § 636(b)(1), and adopted Judge Smith's Report in its entirety. *Sharkey,* 906 F.Supp. at 953–54, 957.

Defendant Lasmo now moves for summary judgment, asserting that it can not be held liable for the allegedly discriminatory offer, because it was made "for and on behalf of Ultramar ... and/or Lasmo plc[, Lasmo's parent]," and alternatively, because it is not subject to the ADEA in connection with the offer. D.'s Mem. of Law in Supp. of Mot. for Summ. Jgt. at 4, 6 ("D.'s Mem."). Sharkey opposes the motion, claiming that Lasmo is liable for the offer and for failing to offer Sharkey other available positions for which he was qualified. *See* Pl.'s Mem. of Law in Opp'n to Mot. for Summ. Jgt. at 9 ("Pl.'s Mem."). Defendant Ultramar also opposes

---

**3.** While Ultrmar's motion was pending, Lasmo filed a memorandum in support of summary judgment, while reserving its right to make a similar motion at a later date. Rpt. at 1.

the motion, contending that there exists a material question of fact as to which company made the offer. *See* Ultramar's Mem. of Law in Opp'n to Mot. for Summ. Jgt. at 3. For the reasons discussed hereinafter, we grant defendant Lasmo's motion in part and deny it in part.

## DISCUSSION

### I. *Summary Judgment Standard*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts warrant judgment for the moving party. FED.R.CIV.P. 56(c); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment, and "the court is required to resolve all ... inferences in favor of the party against whom summary judgment is sought." *Aetna,* 46 F.3d at 202. The court will draw inferences in favor of the nonmoving party, however, only upon determining that such inferences are reasonable in light of the evidence presented. *See Apex Oil Co. v. Di-Mauro,* 822 F.2d 246, 252 (2d Cir.1987). These inferences are based on the record as a whole. *See* FED.R.CIV.P . 56(d); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. *The Offer to Work in Canada*

#### A. *Defendant Lasmo's Liability*

■ On Ultramar's motion, we held that "an issue of fact exists as to which corporate entity [Ultramar or Ultramar Canada] offered employment to plaintiff," and therefore, that "the trier of fact could reasonably find ... defendant Ultramar [liable] for the allegedly discriminatory acts of Mr. Guarino." *Sharkey,* 906 F.Supp. at 954; Rpt. at 32, 34. Lasmo now contends that it can not

be held liable for the allegedly discriminatory offer, because it was made "for and on behalf of Ultramar ... and/or Lasmo plc's Canadian operation," and because it is controlled by Lasmo plc, a foreign company. D.'s Mem. at 4, 6; Lasmo's Reply Mem. on Mot. for Summ. Jgt. at 3 ("Reply"). Sharkey, on the other hand, argues that the offer was made "for and on behalf" of defendants Ultramar or Lasmo for employment at Ultramar, an American corporation. Sharkey also alleges that Lasmo controlled Ultramar at the time the offer was made, and thus stood to profit from the formation of the company. *See* Sharkey Mem. at 2.

Lasmo's argument misconstrues our prior ruling. On Ultramar's motion, we did not hold that the offer was made solely "for and on behalf" of Ultramar or Ultramar Canada; rather, we declined to dismiss Ultramar from the case, because the evidence suggested that it could be held liable for Guarino's acts. Because the prior motion was made solely by Ultramar, we were confronted only with the question of Ultramar's liability. In that Opinion, we suggested, however, that the evidence showed that the offer was made on behalf of both defendants.[4] *See* Rpt. at 30. Furthermore, we found that the offer was for work at defendant Ultramar. Rpt. at 3. Given plaintiff's allegations—that defendant Lasmo controlled defendant Ultramar—and the undisputed facts—that at the time of the offer, Guarino was General Counsel of both defendants, and Lasmo plc was in the process of a complex reorganization—it simply does not follow that because Lasmo may not have made the initial offer, the offer was made solely for the benefit of Ultramar or Ultramar Canada. Considered in the light most favorable to plaintiff, we cannot say as a matter of law that the offer was not made "for and on behalf" of defendant Lasmo.

■ Additionally, Lasmo contends that it should be granted summary judgment, be-

---

4. We note that contrary to Lasmo's assertion, the fact that the Complaint alleged that the actions of defendant Lasmo... were undertaken "in the interests of and on behalf of defendant Ultramar," see Cplt. at ¶ 24, does not end our inquiry. This allegation must be viewed in light of the record as a whole. *See* FED.R.CIV P. 56(d); *Anderson,* 477 U.S. at 248. As previously stated, the Record suggests that the offer was not solely "[for] and on behalf of ... Ultramar." *See, e.g.,* Rpt. at 30. *See also* Cplt. at 11 ("Management of defendant Lasmo, acting in furtherance of the business interests of both defendant Lasmo and defendant Ultramar ... offered [the] positions ... to plaintiff and to [the] two other Vice Presidents of UEL.").

cause Sharkey's claims are not subject to the ADEA. Specifically, Lasmo states that it cannot be held liable under the ADEA, because Lasmo is controlled by Lasmo plc, a foreign company, and because Sharkey was offered employment to work in Canada, at Ultramar Canada, a foreign subsidiary. According to Lasmo, the ADEA applies extraterritorially only to Americans who have been offered positions at an American company or at a foreign-based subsidiary of an American company. *See* Lasmo Mem. at 6.

Lasmo again misstates our prior ruling. On Ultramar's motion, we determined that "a material issue of fact ... exist[s] as to whether Ultramar Canada was a totally foreign entity." *See* Rpt. at 34. We considered this issue on Ultramar's motion, specifically because Lasmo raised it in its memorandum filed in support of that motion. Because Lasmo has already briefed the issue, and has not raised any intervening facts or a change in the applicable law, we decline to revisit it. *See, e.g., Wright v. Cayan*, 817 F.2d 999, 1002 n. 3 (2d Cir.1987); *Erie Conduit Corp. v. Met. Asphalt Paving Assoc.*, 560 F.Supp. 305, 308 (E.D.N.Y.1983).

■ Furthermore, Lasmo is incorrect on the law. The ADEA does not apply only to companies owned by American employers. According to the statute, it "presum[ably]" applies to Americans who have been offered jobs at "foreign corporations ... *controlled by American employers.*" *See* 29 U.S.C. § 623(h)(1) (emphasis added). An American employer controls a foreign corporation if there exists (1) an interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *Id.*, § 623(h)(3). An employer that merely controls, and does not own, an entity that has violated the ADEA may still be held liable under the Act. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240–41 (2d Cir. 1995).

Thus, Lasmo's argument, that it is exempt from the ADEA, because it is owned by a foreign company, is misguided. The pertinent inquiry is the ownership status of the company that was to have employed the plaintiff and the location of the prospective work site, not "which entity made the final decision regarding the matter alleged to be discriminatory[ ]." Reply at 4. While the Court of Appeals has yet to consider the issue, courts in other circuits have held that "the relevant work site is the location of the[ ] position [offered], [and] not the location of [the plaintiff's] employment at the time of the alleged discrimination." *Denty v. Smith-Kline Beecham Corp.*, 907 F.Supp. 879, 881 & n. 4, 884 (E.D.Pa.1995) (denying coverage where plaintiff was employed in United States by wholly owned subsidiary of British parent and had applied for positions with parent abroad), *aff'd*, 109 F.3d 147 (3d Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 74, 139 L.Ed.2d 34 (1997); *Lopez v. Pan Am. World Services, Inc.*, 813 F.2d 1118, 1120 (11th Cir.1987) (2–1 decision) (same, *prior to 1984 amendment*,[5] where the relevant "work station ... would have been Caracas, Venezuela" and the employer was American). In each of these cases, the employee was the one to seek the position at issue, and the courts specifically noted that the employment decision was made overseas, and in one instance, exclusively by executives working directly for the foreign parent. *See* 813 F.2d at 1120; *Denty*, 907 F.Supp. at 881 & n. 4. Here, Sharkey was offered a position at Ultramar, when his current position was eliminated, pursuant to a corporate merger and reorganization. We note that *Denty* merely held that "the ADEA does not apply when a foreign corporation controls an American corporation and the employment is with the foreign parent abroad," 109 F.3d at 151, and that *Lopez* was specifically based on the ADEA prior to its amendment in 1984. Here, we have already determined that Sharkey was offered employment with Ultramar, an American corporation in June 1992, which became an entity entirely separate to Lasmo

**5.** In 1984, the ADEA was amended to extend coverage to United States citizens employed abroad by companies controlled by American corporations, except where application of the ADEA would violate the law of the foreign country where the citizen was employed. Older Americans Act Amendments of 1984, Pub.L. No. 98–459, § 802(b)(1), (b)(2), 98 Stat. 1767, 1792 (codified as amended at 29 U.S.C. § 623(f)(1), (h)(1)).

plc on July 31, 1992. *See* Rpt. at 2, 19. For this reason, we must reject Lasmo's argument and deny summary judgment with respect to the offer to work in Canada.

### B. *Guarino as Lasmo's Employee or Agent*

As previously stated, the parties contest whether Guarino made the offer "for and on behalf" of defendant Lasmo. Lasmo argues that Guarino made the offer solely on behalf of Ultramar or Ultramar Canada. Plaintiff contends that Guarino made the offer "for and on behalf of" defendant Lasmo, because Lasmo employed Guarino and stood to benefit from the offer, or alternatively, because Guarino was Lasmo's agent.

#### 1. Guarino as Lasmo's Employee

■ It is uncontroverted that when Sharkey received his offer, Guarino was employed as General Counsel to defendant Lasmo. The parties dispute, however, whether Guarino was acting in the scope of his employment with Lasmo when he discussed the offer with Sharkey. We hold that plaintiff has submitted sufficient evidence to raise a question of material fact regarding the scope of Guarino's employment. Alternatively, we hold that plaintiff need not demonstrate that Guarino was acting in the scope of his employment, in order for Lasmo to be held liable for Guarino's acts, because the evidence supports a finding that Guarino was acting as Lasmo's agent.

#### 2. Guarino's Scope of Employment With Lasmo

Whether an employee has committed a tort in the scope of his employment is a mixed question of law and fact. *See, e.g., Cabrera v. Jakabovitz,* 24 F.3d 372, 385 (2d Cir.1994); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988); *Slotkin v. Citizens Casualty Co.,* 614 F.2d 301, 317 (2d Cir.1979). In other words, such determination requires the application of a legal standard to a set of historical facts. If the plaintiff has produced enough evidence to support a finding, and the material facts are in dispute, the issue of whether an employee acted within the scope of employment should be determined at trial. *See, e.g., Cabrera,* 24 F.3d at 386 ("Unless the facts are insufficient to support [the finding] or there is no dispute as to the historical facts, the question ... should be submitted to the jury so that it may apply the applicable legal standard."); *Slotkin,* 614 F.2d at 317 ("[Plaintiffs'] burden of proof to avoid dismissal of the complaint was not to prove the agency but merely to adduce sufficient evidence to take the issue to the jury."). In fact, "[o]nly if reasonable [people] could not reach differing conclusions on the issue may the question be taken from the jury." *Baker v. Texas & Pacific Railway Co.,* 359 U.S. 227, 228, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959).

According to the Supreme Court, where an employer's liability is premised on the allegedly discriminatory acts of an employee, "courts [should] look to agency principles for guidance." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In *Frankel v. Bally, Inc.,* 987 F.2d 86, 87–90 (2d Cir.1993), the Court of Appeals for the Second Circuit instructed us to use agency principles to determine an employer's liability under the ADEA where an individual's scope of employment is at issue. *Accord Tuohy v. Bally, Inc.,* No. 95 Civ. 1499, 1997 WL 66784, at *3 (S.D.N.Y. Feb.14, 1997) (interpreting *Frankel* to require application of agency principles in dispute as to scope of employment).

As a general rule, an employer will not be held liable for torts committed by an employee occurring outside the scope of employment, unless the employee "purported to act or speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *See* Restatement (Second) of Agency §§ 219(1) & (2)(d) (1958). The New York State Court of Appeals has formulated a test to determine whether an employee's tort has been committed in the scope of employment. According to the test, we must consider (1) the connection between the time, place and occasion for the act; (2) the history of the relationship between the employer and employee as spelled out in actual practice; (3) whether the act is one commonly done by such an

employee; (4) the extent of departure from normal methods of performance; and (5) whether the specific act was one that the employer could reasonably have anticipated. *Riviello v. Waldron*, 47 N.Y.2d 297, 391 N.E.2d 1278, 1281, 418 N.Y.S.2d 300, 303 (1979) (citing Restatement (Second) of Agency § 229).

In *Riviello*, the Court of Appeals affirmed a finding that a waiter committed a tort while acting within the scope of employment, when the waiter assaulted a customer with a knife while "mingling with the [employer's] patrons." 391 N.E.2d at 1280, 1282, 418 N.Y.S.2d at 301, 305. The Court held that to be held liable under the scope of employment doctrine, "the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected." 391 N.E.2d at 1282, 418 N.Y.S.2d at 305 (citing Restatement (Second) of Agency § 1884). In so ruling, the Court reasoned that while the waiter's job was to take orders, the act of "mingling" was not "beyond the range of things commonly done by such an employee." 391 N.E.2d at 1282, 418 N.Y.S.2d at 305.

In *Petrousky v. United States*, 728 F.Supp. 890, 897–98 (N.D.N.Y.1990), the court held that a supervisor who had authored five memoranda allegedly libeling an employee had acted within the scope of her employment, because disciplining subordinates was incidental to her position. Though the court could not determine whether it was the supervisor's "actual practice" to issue such memoranda, "or whether there were departures from [her] normal methods of performance," it appeared that the supervisor "was expected to discipline her subordinates." *Id.* The court then concluded that it was only "natural" for a supervisor to discipline subordinates by memoranda. *Id.* at 898. In so determining, the court reasoned that the supervisor had issued the memoranda "at the workplace and during working hours," and that it was generally foreseeable that she could have written memoranda regarding the conduct of her subordinates, pursuant to her supervisory authority. *Id.*

In this case, Sharkey has adduced enough proof to support a finding that Guarino was acting in the scope of his employment when he discussed the offer. The facts suggest that while Patel may have made the initial offer of employment, the offer was in fact made on behalf of defendant Ultramar or defendant Lasmo or both, and that Guarino assisted with the negotiations. First, Sharkey alleges that "Patel expressly told [him] that he (Patel) was tired of being the middleman and told [Sharkey] to discuss the offer directly with Guarino." Pl.'s Mem. at 6 (citing Sharkey Aff. ¶ 12). *See also* Sharkey Aff. ¶ 12 ("Patel expressed frustration and said he felt like a messenger, communicating offers back and forth.... [He] told me that he was going to bow out ... and that I should deal directly with Guarino."). Sharkey also claims that he met with Guarino to discuss the proposed offer and that "Guarino refused [his] requests (to) match ... the packages offered to the younger men." Sharkey Aff. ¶ 12. Sharkey argues that in refusing to negotiate the terms of his employment, Guarino discriminated against him. *See* Pl.'s Mem. at 5–6. It is undisputed that after Ultramar Canada had initiated negotiations, a meeting between Sharkey and Guarino was held in Guarino's office at Lasmo headquarters, where Guarino was employed as Senior Vice President and General Counsel. The first factor of the *Riviello* test is therefore met. It is also undisputed that Guarino, as officer to both Lasmo and Ultramar, played an instrumental role in Ultramar's formation. *See, e.g.,* Guarino Dep. at 47, 50–57, 62–63, 82–83, 95; Rpt. at 28. Lasmo, however, seems to deny that Guarino negotiated Sharkey's offer, or was in any way responsible for the allegedly discriminatory terms of employment. *See* D.'s Mem. at 4 ("Sharkey seeks to hold [Lasmo] responsible for th[e] alleged discriminatory job offer because one of its employees (Guarino) was involved in the transmission of the offer"). The evidence belies the fact that Guarino merely transmitted the offer. It seems clear, rather, that Guarino was not only involved with the offer to Sharkey but with the offers to Sharkey's colleagues as well. *See* Rpt. at 3. Thus, the evidence supports the third and fourth *Riviello* factors, that Guari-

no conducted himself similarly with other employees. Finally, while the evidence does not reveal the extent of Guarino's usual involvement in extending offers of employment, it cannot be said that assisting in the making of such offers is uncommon to corporate senior vice presidents in general.[6] The second *Riviello* factor is therefore met. Finally, it is not unforeseeable that Guarino would have assisted with negotiating offers of employment at Ultramar. At the time the offers were made, not only was Guarino a high-level officer at Ultramar, he was admittedly in part responsible for forming the new corporation. Accordingly, *Riviello's* fifth factor is met.

That Guarino's conduct sufficiently meets the five-factor test, however, does not end our inquiry. The Restatement adds that to have been within the scope of employment, an employee's acts must have been "actuated, at least in part, by a purpose to serve the master." *See also Cronin v. Hertz Corp.,* 818 F.2d 1064, 1067 (2d Cir.1987) (citing Restatement). The cases make clear that for a tort to have been committed within the scope of employment, an employee's primary motive need not have been to serve the master, nor need the master have benefitted financially from the tort. *E.g., Lewis v. Walston & Co., Inc.,* 487 F.2d 617, 624 (5th Cir.1973); *Volmar Distributors, Inc. v. New York Post Co.,* 899 F.Supp. 1187, 1194 (S.D.N.Y.1995); *Meyer v. Runyon,* 869 F.Supp. 70, 79 (D.Mass.1994); *In re Laser Arms Corp. Sec. Lit.,* 794 F.Supp. 475, 485 (S.D.N.Y.1989), *aff'd,* 969 F.2d 15 (2d Cir.1992); *Amendolare v. Schenkers Int'l Forwarders,* 747 F.Supp. 162, 170 (E.D.N.Y.1990); *Petrousky,* 728 F.Supp. at 898. The cases do however suggest that in order to be within the scope of employment, the tort must have been committed in part to benefit the employer and the employer must have received some benefit. *Cf. Lewis,* 487 F.2d at 624 (doctrine

"does not require that the act have conferred any particular benefit, financial or otherwise, on the employer," where the act is "sufficiently similar" to acts authorized by the employer). Nevertheless, as the Court of Appeals has recognized, "[c]ourts have gone to considerable lengths to find such a purpose." *Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167, 170 (2d Cir.1968) (Friendly, J.).

In *Lewis,* for example, the Court of Appeals for the Fifth Circuit reversed an award of judgment n.o.v. in favor of a defendant brokerage house where its representative illegally traded in unregistered securities. 487 F.2d at 624. Of significance to the court was evidence that in making the trades, the representative performed acts common to a brokerage house and used the broker's office to solicit customers. Given this evidence, the court found that the representative could have been acting within the scope of her employment as broker, notwithstanding the facts that she was not authorized to deal in unregistered securities, that the transactions were not executed through the brokerage house, and that the broker did not benefit from any of the transactions. *Id.* at 623–24. The court explained that the central issue was not whether the trades were authorized but rather whether the trades were "sufficiently similar" to "authorized conduct," typical of brokers. *Id.* at 624. *See also In re Laser Arms,* 794 F.Supp. at 485 (purchase and sale of unregistered securities "incidental" to transactions authorized by broker-dealer and therefore within scope of trader's employment).

In *Amendolare,* the court determined that the defendant union officers did not act within the scope of their employment when they extracted payoffs from companies in return for agreements to terminate the employment of union members, because the scheme did

---

**6.** Though Lasmo claims that Guarino's "regular duties as general counsel for [Lasmo] did not include ... making ... job offers to other persons," and cites Guarino's deposition testimony, Lasmo submits only one shard of evidence on point. When plaintiff's counsel asks whether "[a]s general counsel of [Lasmo]" Guarino "had responsibilities for personnel matters," Guarino says "No." Guarino Dep. at 50, ¶¶ 9–13. Just

because handling personnel matters was not part of his job as General Counsel for Lasmo does not mean that he did not participate in negotiating the offers. Indeed, elsewhere, Guarino states that he was "responsible [in part] for form[ing] the new Ultramar," and that "after July 6, he started working for Ultramar." *Id.* at 51, ¶¶ 4–5; 51, ¶¶ 6–9.

not benefit the union in any way. 747 F.Supp. at 170. In dismissing the case against the union, the court compared the facts to *Local 1814, Int'l Longshoremen's Assoc. v. NLRB*, 735 F.2d 1384, 1395 (D.C.Cir.1984), in which there existed sufficient evidence to support a finding that the union president had acted "within the 'general area' of his authority" when he used illegal kickbacks to extend union membership. *See* 735 F.2d at 1395. Though the union did not receive any of the illegal funds in *Local 1814*, the Court of Appeals for the D.C. Circuit denied summary judgment, because the evidence suggested that the union "benefitted generally from the extension of its strength and authority." *Id.* at 1396. *See also Volmar Distributors*, 899 F.Supp. at 1194, 1198 (plaintiff need not show employer received "economic" benefit to be liable under RICO; dismissing case because plaintiff did not allege any benefit to employer).

Here, Lasmo contends that Guarino acted outside the scope of his employment, because Guarino was acting solely for the benefit of Ultramar, Ultramar Canada, or Lasmo plc, and because the offer did not financially benefit Lasmo. *See* Reply at 4–5. The latter part of this argument is untenable in light of the case law in this circuit. Thus, we cannot hold that as a matter of law, because Lasmo did not benefit financially from the offer, Guarino acted outside the scope of his employment. Instead, we must consider whether Sharkey has adduced enough evidence to show that Guarino was in part motivated to serve Lasmo and that the offer benefitted Lasmo *in general*. *Cf. Moham v. Steego Corp.*, 3 F.3d 873, 876 (5th Cir.1993) (predecessor company not liable for torts committed on behalf of successor, where evidence did not suggest that predecessor could benefit from the allegedly discriminatory hiring).

We conclude that Sharkey has satisfied this burden. Guarino has testified that Lasmo had made it his responsibility to create and form the new Ultramar and that "it was in [Lasmo plc's] interests to have the [initial public offering] be successful." Guarino Dep. at 52 ¶¶ 6–9, 18–19. While he may have been acting primarily on behalf of Ultramar or Ultramar Canada, the inquiry on summary judgment is whether the evidence shows that the employee acted in part to benefit his employer and whether the employer stood to benefit from the tort at all. Given Guarino's testimony, we can not grant summary judgment to Lasmo on these grounds.

Based on the foregoing, we cannot say that as a matter of law, Guarino did not discuss Sharkey's offer in the scope of his employment with defendant Lasmo. Summary judgment on this issue is therefore inappropriate.

### 3. Guarino as Lasmo and/or Ultramar's Agent

Sharkey argues that even if Guarino was not acting within the scope of his employment, that Guarino was acting as Ultramar's or Lasmo's agent or both, and that Lasmo should therefore be held liable under the ADEA. Pl.'s Mem. at 14–18. Even if Sharkey has not adduced enough evidence to show that Guarino had acted within the scope of his employment, Sharkey has sufficiently shown that Guarino was Lasmo's or Ultramar's agent, or both, and that he may have used this relationship when discussing the allegedly discriminatory offer.

### a. Guarino as Lasmo's Agent

An employer may be held liable for torts committed outside the scope of employment, if the employee "purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*" Restatement (Second) of Agency §§ 219(1) & (2)(d) (emphasis added). *See also Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.1994) (employer liable under Title VII where supervisor uses actual or apparent authority to further sexual harassment or is otherwise aided in accomplishing discrimination by existence of agency relationship).

In *Karibian*, the Court of Appeals reversed an order granting summary judgment to a defendant employer where the evidence suggested that plaintiff's supervisor · had "capitalized upon his authority over her employment to force her to endure a prolonged, violent and demeaning sexual relationship."

14 F.3d at 780. The court reasoned that employers are universally held liable for discriminatory conduct by a supervisor which "affect[s] the economic status of the employee." *Id. See also Watts v. New York City Police Dept.,* 724 F.Supp. 99, 106 n. 6 (S.D.N.Y.1989) (employer liable where supervisor accomplishes discrimination "by means furnished ... by ... employer (such as the supervisor's influence or control over hiring, job performance evaluations, work assignments, or promotions)").

■ Here, the evidence suggests that Guarino was aided in committing the alleged discrimination by his agency relationship with Lasmo. As previously stated, the evidence shows that Guarino discussed the offer with Sharkey at Lasmo headquarters, specifically, in the office he used as General Counsel. Though it is unclear whether Guarino capitalized on this relationship to discuss the offer, Sharkey has alleged by affidavit that in discussing the offer, he thought Guarino was acting on behalf of Lasmo. *See* Sharkey Aff. at ¶ 15. Though this is certainly not a case in which an agency relationship has been exploited to commit continued and prolonged discrimination, such as sexual harassment perpetrated in a hostile environment, the evidence supports that an allegedly discriminatory employment was closely connected to the means furnished by Guarino's employer—it was a non-negotiable job offer with precise terms, which were allegedly less favorable than those received by younger colleagues. According to Sharkey, the terms of the offer and his subsequent meeting with Guarino did in fact "influence or control" his decision to reject the employment package offered to him.

b. Guarino as Ultramar's Agent

■ Even if Guarino was acting solely as Ultramar's agent, Lasmo could still be held liable for Guarino's allegedly discriminatory acts under the integrated enterprise doctrine.[7] According to the this doctrine, if Lasmo and Ultramar were sufficiently related at the time of the offer, Lasmo would be held liable for discrimination perpetrated by Ultramar or one of its agents. *See, e.g., Arrowsmith,* 69 F.3d at 1240. This is true even though Lasmo was not Ultramar's parent. *See, e.g.,* Dortz v. City of New York, 904 F.Supp. 127, 145–47 (S.D.N.Y.1995); *Regan v. In the Heat of the Nite, Inc.,* No. 93 Civ. 862, 1995 WL 413249, at *4 (S.D.N.Y. July 12, 1995).

In *Arrowsmith,* the Court of Appeals determined that a parent could be held liable for the civil rights violations of its subsidiary, if the parent and subsidiary maintained (1) interrelated operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. 69 F.3d at 1240 (citation omitted). The Court held that the one " 'critical question' " was the following: " 'What entity made the final decisions regarding employment matters related to the person claiming discrimination?' " 69 F.3d at 1240 (citation omitted). The Court concluded that a plaintiff could satisfy the four-part test upon " 'showing that there is an amount of participation [by the parent that] is sufficient and necessary to the total employment process [of the subsidiary], even absent total control or ultimate authority over hiring decisions.' " *Id.* (citation omitted).

The Court then reversed an order granting summary judgment to the defendant, because there existed "substantial evidence" that the parent had run the subsidiary "in a direct, hands-on fashion, establishing the [subsidiary's] operating ... and management practices," screening the subsidiary's employment applications, and reviewing "all major employment decisions." *Id.* at 1241. The Court stressed the second factor of the

---

7. Lasmo relies on several cases to suggest that it cannot be held liable for acts committed by Guarino as Ultramar's agent. Reply at 4 n. 7. As Lasmo itself acknowledges, however, these cases merely assert that a while principal may be held liable for the acts of its agent, the principal's employee may not be individually sued. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–14 (2d Cir.1995) (holding that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"); *Ausfeldt v. Runyon,* 950 F.Supp. 478, 488 (N.D.N.Y. 1997) (following Tomka to dismiss defendant postal worker sued in his individual capacity). *See also Falbaum v. Pomerantz,* 891 F.Supp. 986, 991 (S.D.N.Y.1995) (individual employees cannot be held liable under the ADEA). Lasmo's argument is therefore unavailing.

test—centralized control of labor relations—noting that the plaintiff "was herself hired" by the parent's vice president of human resources and "was fired directly" by an employee paid by the parent. *Id.* Finally, the court noted that the companies "maintained a common management structure," whereby the parent's president "operated out of" the subsidiary's office.

Here, Sharkey alleges that Ultramar and Ultramar Energy were "part of an international conglomerate of corporations, formerly known as the Ultramar Group." *See* Sharkey Aff. ¶ 2. Sharkey also alleges that the operations of Ultramar Energy ... were ... coordinated by [Lasmo] which had been designated by Lasmo plc as the entity responsible for managing [all] the North American oil business subsidiaries of Ultramar plc. Sharkey Aff. ¶ 5. Sharkey further alleges that his job offer was made "specifically in furtherance of [Lasmos'] assigned task since, by hiring officers [such as Sharkey] who would maintain the continuity of the oil trading and supply functions associated with the refining operations, [Lasmo] would make the entity more attractive to potential purchasers...." Pl.'s Mem. at 11; Sharkey Aff. ¶ 7. The evidence further suggests that Ultramar continued to be a "shell corporation" controlled by Lasmo or Lasmo plc from June to July 1992, at which time Ultramar became a separate and independent corporation. *See, e.g.,* Pickerill Aff. ¶ 3. Plaintiff met with Guarino in June 1992 to discuss the offer. At the time of the offer, Ultramar was an inactive corporation with no independent operations, offices or management. Its only employees were officers of Lasmo, paid by Lasmo. *See* Sharkey Aff. ¶ 15 n. 4.

In light of the foregoing, we believe that there exists enough evidence to suggest that Lasmo and Ultramar constituted a single employer at the time Guarino discussed the offer with Sharkey. There is little question that either Lasmo or Lasmo plc controlled the "day to day functioning" of Ultramar until July 1992 and that there was an absence of an arms' length relationship between the companies. *See, e.g.,* Guarino Dep. at 47, 52, 56–57. Furthermore, the evidence suggests that Ultramar was initially created by Lasmo as a vehicle through which Lasmo plc could consolidate and/or divest itself of its North American oil holdings. If Lasmo had been specifically delegated the responsibility of organizing Ultramar's oil trading and supply functions, and Sharkey had been intended to work in that area, the evidence would suggest that Guarino may have sufficiently assisted in the making of the offer. Under *Arrowsmith,* liability would not depend on whether Lasmo had the final say in the hiring decision, but rather, whether the input of Guarino, or any other Lasmo employee, was "sufficient and necessary to the total employment process." 69 F.3d at 1240. As previously stated, we have determined that Guarino was also involved with transmitting the offers to McAward and Kuzmin, and that Guarino was using his Tarrytown office as General Counsel to both companies. *Accord Hamilton v. New York State Dept. of Mental Hygiene,* 876 F.Supp. 470, 474 (W.D.N.Y. 1994) ("[T]hose who are responsible for making and or contributing to employment decisions for the defendant employer may be liable as agents ... under the ADEA.") *Cf. Dewey v. PTT Telecom Netherlands, U.S. Inc.,* No. 94 Civ. 5983, 1995 WL 425005, at *2 (S.D.N.Y.1995), *aff'd,* 101 F.3d 1392 (2d Cir. 1996) (declining to find integrated enterprise where plaintiff alleged that parent had been "immediately informed" of subsidiary's decision to fire her). *See also Ward v. Gordon,* 999 F.2d 1399 (9th Cir.1993) (where military officer was "borrowed servant" to private hospital, he remained servant to the government, because service at hospital furthered rather than compromised interests of both).

Because we find that there exists sufficient evidence to raise a material question of fact regarding whether Guarino discussed the offer in the scope of his employment with Lasmo or was acting as Lasmo's or Ultramar's agent, while Ultramar was under Lasmo's control, we cannot grant summary judgment to Lasmo.

## III. *Other Available Positions*

In addition to claiming that the offer to work in Canada was discriminatory, Sharkey alleges that he was denied other positions with the Lasmo companies, because of his

age. *See* Cplt. ¶ 18; Pl.'s Mem. at 18–19. In its reply, Lasmo, apparently for the first time, argues that we should not consider this claim, because Sharkey failed to raise it in his EEOC charge, and that even if he did state the claim in the charge, it was barred by the statute of limitations.[8]

We need not consider whether Sharkey raised this claim in his EEOC charge, because we conclude that it was barred by the statute of limitations when Sharkey filed the charge. As a general matter, we will not consider allegations of discrimination which are for the first time raised in court, because they have not been timely filed with the EEOC. *See Butts v. City of New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993). In order for us to hear a claim of discrimination, the claim must have been included in a timely filed charge, or be reasonably related to that charge. *Id.* at 1401–03. Otherwise, plaintiff must "'bear [the] heavy burden [of] establishing that equitable principles should permit the procedural requirements ... to be bypassed....'" *Hourahan v. Ecuadorian Line, Inc.*, No. 95 Civ. 10698, 1997 WL 2518, at *5 (S.D.N.Y. Jan.3, 1997) (citation omitted). *See also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (the "filing [of] a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like the statute of limitations, is subject to waiver, estoppel, and equitable tolling"). "In states ... that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitation for filing a charge of discrimination is 300 days." *Butts*, 990 F.2d at 1401. Therefore, Sharkey's allegation that he was not offered positions on account of his age, is barred if it was not administratively filed within the limitation period. *See Gomes v. Avco Corp.*, 964 F.2d 1330, 1332–33 (2d Cir. 1992); *Samuel v. Merrill Lynch Pierce Fen-*

*ner & Smith*, 771 F.Supp. 47, 48 (S.D.N.Y. 1991).

"When a plaintiff experiences a 'continuous practice and policy of discrimination,' however, 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir.1994) (citations omitted). The Court of Appeals has held that "a continuing violation may be found where there is proof of specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted ... to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell*, 23 F.3d at 704. Discrete incidents of discrimination that are not related to such policies or practices, however, do not amount to a continuing violation. *Id.* (citing *Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2d Cir.1993)). Moreover, "[t]o benefit from the continuing violation doctrine, a plaintiff must clearly assert the continuing violation both in the EEOC filing and in the complaint." *Brown v. City of New York*, 869 F.Supp. 158, 168–69 (S.D.N.Y.1994) (citing *Cook v. Pan Am. World Airways, Inc.*, 771 F.2d 635, 646 (2d Cir.1985)).

In the case at bar, Sharkey filed an EEOC charge on or about April 19, 1993, at which time he claimed that Roger Rawstron, a "new hire," was given a job that was never offered to Sharkey. Rawstron was hired on or before May 11, 1992, more than 300 days before Sharkey brought the charge. While Sharkey suggests that he was denied similar positions during the limitations period, he cites no specific job opportunities—other than Rawstron's—that he was denied. Thus, Lasmo argues that Sharkey's additional claims are time-barred. Sharkey attempts to circumvent the statute of limitations by claiming that his additional allegations amount to a "continuing violation." Surreply at 2. Relying on authority from other circuits, Sharkey contends that the allegations regarding the Rawstron offer are actionable,

---

8. We consider the statute of limitations argument here, because it was asserted in Lasmo's answer, Ans. at ¶ 2, and because we specifically granted Sharkey the opportunity to reply. Sharkey replied to the statute of limitations argument in his

Surreply Mem. in Opp'n to Lasmo's Mot. for Summ. Jgt. ("Surreply"). *Cf. Burton v. Northern Dutchess Hosp.*, 106 F.R.D. 477 (S.D.N.Y. 1985).

even though they were not stated in the formal charge, because Lasmo's "failure to consider him for the Rawstron [sic] position ... was part of a series of acts ... closely related in time, involving the same time of discriminatory conduct—defendant's (alleged) refusal to offer plaintiff an appropriate position in its work force because of his age." Surreply at 2.

Before considering his argument, we note that Sharkey's "omission of Second Circuit authority is telling." *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y.1989). It has been uniformly recognized that courts in this circuit disfavor application of the continuing violation doctrine. *E.g., Bawa v. Brookhaven Nat'l Lab. Assoc. Univ., Inc.*, 968 F.Supp. 865, 868 (E.D.N.Y.1997); *Samimy v. Cornell Univ.*, 961 F.Supp. 489, 494 (W.D.N.Y.1997); *Lloyd v. WABC–TV*, 879 F.Supp. 394, 399 (S.D.N.Y.1995); *Blesedell*, 708 F.Supp. at 1415; *Bradley v. Consolidated Edison Co.*, 657 F.Supp. 197, 204 (S.D.N.Y.1987); *McPartland v. Am. Broadcasting Companies, Inc.*, 623 F.Supp. 1334, 1338 (S.D.N.Y.1985). "Indeed, only 'compelling circumstances' will warrant [use] of th[is] exception to·the statute of limitations." *Blesedell*, 708 F.Supp. at 1415 (citing *La Beach v. Nestle Co., Inc.*, 658 F.Supp. 676, 687 (S.D.N.Y.1987)). Moreover, the Court of Appeals has recently suggested that a finding of "compelling circumstances" may be limited to situations in which the effect of the alleged discrimination will likely be felt only at a later date. *See Pollis v. New School for Social Research*, 132 F.3d 115, 118–19 (2d Cir.1997). According to the Court, such circumstances justify a remedy for discrimination occurring prior to the limitations period, because claimants tend to bring charges only after a harm occurs. *See id.* at 118–19 (determining that doctrine did not apply to claim alleging discriminatory pay scale, because if plaintiff were paid less due to her sex, effect would be "immediate").

▮▮▮▮ In this case, Sharkey did not allege a "continuing violation" when he filed his EEOC charge, nor when he completed his Intake Questionnaire. *See* Sharkey Aff. Ex. D, E. He may not rely on this doctrine to avoid the statute of limitations, simply by alleging a continuing violation in his complaint. *See Pan Am. World Airways*, 771 F.2d at 646. This aside, we note that Sharkey has not even alleged a continuing violation in the Complaint; he appears to have raised the issue for the first time in response to Lasmo's motion. Even in these papers, Sharkey does not "clearly" set forth the claim. He merely asserts that Lasmo's "failure to consider him for the Ralstron [sic] position ... was part of a series of acts ... closely related in time, involving the same time of discriminatory conduct—defendant's (alleged) refusal to offer plaintiff an appropriate position in its work force because of his age." Surreply at 2. This allegation, while supported by affidavit, is vague and conclusory, because Sharkey has failed to cite any other offers not extended to him. *See Butts*, 990 F.2d at 1403; *Cohn v. New York City Dep't of Parks*, No. 91 Civ. 6943, 1996 WL 449539, at *7 (S.D.N.Y. Aug.9, 1996), *aff'd*, 112 F.3d 503 (2d Cir.1997); *Lloyd*, 879 F.Supp. at 400. While Sharkey attaches a copy of a memorandum stating that positions would be filled "on the basis of 'best person for the job,' ... from the existing LASMO [and] Ultramar populations." However, this policy certainly does not imply that there will be discrimination on the basis of age or any other impermissible factor. Quite the opposite, it suggests employment on the basis of merit alone. *See* Sharkey Aff. Ex. F (alteration in original). *Compare Brown v. Time, Inc.*, No. 95 Civ. 10081, 1997 WL 231143, at *4 (S.D.N.Y. May 7, 1997) (newsletter circulated by chairman stating need to "make staff diversity a reality [by] ... promoting minorities" insufficient to show policy favoring African–Americans) *with Cornwell*, 23 F.3d at 704 (finding specifically that employer's personnel policies discriminated against women) *and EEOC v. Cushman & Wakefield, Inc.*, 643 F.Supp. 209, (S.D.N.Y.1986) (testimony established nine of thirteen women who took maternity leave pursuant to policy were terminated, including plaintiff). Because Sharkey has not stated a continuing violation in the pleadings nor in the charge, *see* Sharkey Aff. Ex. E–F, the continuing violation doctrine does not apply. *Accord Bawa*, 968 F.Supp. at 868 (dismissing pre-limitation period claims,

where plaintiff "did not clearly state continuing violation by marking the 'Continuing Action' box on the Charge" and neglected to raise issue in complaint). *Cf. Carrasco v. New York City Off–Track Betting Corp.*, 858 F.Supp. 28, 31–32 (S.D.N.Y.1994), *aff'd*, 50 F.3d 3 (2d Cir.1995) (plaintiff failed to allege continuing violation where charge stated she was denied promotion; "fact that the 'Continuing Action' box was checked ... not dispositive"). We therefore dismiss the remainder of Sharkey's claims.

## CONCLUSION

Based on the foregoing, we deny defendant Lasmo's motion for summary judgment with respect to plaintiff's claim that he was offered less favorable employment on account of his age. We grant Lasmo's motion to the extent that plaintiff claims he was denied other employment opportunities, including the Rawstron position, and therefore dismiss the claims alleged in paragraph 19 of the Complaint.

SO ORDERED.